12  219
110  618

## Wm. Gil *v.* Williams & Davis.

A contract stipulating a compensation for services to be rendered in procuring an Act to be passed by the Legislature for the relief of the party promising to pay therefor, is *contra bonos mores*, and cannot be enforced, even although no improper means are alleged or shown to have been resorted to by the agent in obtaining the passage of the Act.

In a case of this kind, which is an exception to the general rule, the party himself will be permitted to allege that the contract was contrary to good morals.

APPEAL from the District Court of East Baton Rouge, *Robertson*, J.

*J. J. Burk*, for plaintiff and appellant. *J. M. McCutcheon* and *Coxe & Breaux*, for defendants.

SPOFFORD, J. One *Wm. H. Williams* having been convicted of importing slaves into the State in violation of the first section of the statute of the 29th January, 1817, the slaves were judicially declared forfeited to the State by virtue of the statute. See the *State* v. *Williams*, 7 Rob. 252, where a report of the facts may be found.

GIL
*v.*
WILLIAMS.

Subsequently one *Thomas N. Davis* executed the following obligation, which is the basis of the present suit:

"$1500.                                    BATON ROUGE, March 13th, 1850.

"For value received, I promise to pay to *A. M. Dunn, Wm. Gil* and *J. C. Patterson* the sum of fifteen hundred dollars, *on condition* that the State of Louisiana shall pay indemnity for a certain lot of slaves, which were seized by this State as the property of *William H. Williams*, indemnity for which is now claimed by *Thomas N. Davis* and *William H. Williams*."

(Signed)                                   THOMAS N. DAVIS."

The plaintiff has appealed from a judgment dismissing his claim for five hundred dollars on this agreement.

There are various defences, but as we concur in the opinion of the District Judge that the obligation sued upon was founded on an illicit cause, we shall only notice that feature of the case.

The plaintiff alleges that the consideration of the contract was his professional services as a lawyer, in presenting and prosecuting the claim of said *Davis* and *Williams* before the Legislature of Louisiana, and that he diligently and effectually served until the condition of the obligation was fulfilled, and the indemnity granted by the Legislature. In proof of his having complied, with his part of the contract, the petitioner offered in evidence "An Act for the relief of *William H. Williams*," approved March 18th, 1852, (Sess. Acts, 186) and another Act with the same title, approved Jan. 23d, 1856, (Sess Acts, 3). He also offered a witness who testified that the plaintiff was active in circulating documents relative to the application of *Williams* among the members of the Legislature. The Acts offered in evidence both state upon their face that they are "acts of clemency" to *Williams*. They were so styled because they relieved him from some of the effects of a forfeiture legally and justly incurred under the laws of the State.

Here, then, we have the case of a man, with no claim in law, petitioning the Legislature for a special Act of pecuniary bounty to himself, and contracting to pay a lawyer a specific sum of money only upon the condition that the lawyer succeeds in inducing the Legislature to grant the bounty. If the scheme fails, the lawyer is to get nothing, no matter how great his labor; if it succeeds, he is, in effect, to partake of the bounty.

If it were consistent with law, public order and good morals for men to make such contracts as this, we would be called on to inquire further into the history of this novel cause; but we are stopped at the threshold by a conviction that law, public order and good morals strike all such contracts with nullity. C. C. 1887, 1889.

These bargains, to profit jointly by what can be procured from the legislative generosity at the public expense, have a direct tendency to seduce legislators from the line of their duty, and to foster that system of special and exceptional legislation which is a marked vice of the times.

We believe it has been uniformly held that a contract for a contingent compensation for obtaining an Act of the Legislature is void by the policy of the law. It is not necessary that improper influences should have been used in a particular case to affect such a contract with nullity. The law looks to the general tendency of things; it opposes the beginnings of evil; it shuts the door against temptation by sweeping rules, which admit of no evasion.

The plaintiff in this case cannot recover, not because he has resorted to bad

means in order to procure the passage of laws in which he had a direct pecuniary interest, for of this there is no proof and no imputation, but because he has made a contingent contract, which, if enforced in this case, might open the door to a practice of corruption and to the use of sinister influences.

Upon the general subject we may refer to the cases of *Fuller* v. *Dame*, 18 Pick. 470; *Hatzfield* v. *Gulden*, 7 Watts, 152; *Clippenger* v. *Hepbaugh*, 5 Watts and Serg., 315; *Wood* v. *McCann*, 6 Dana, 366; *Hunt* v. *Test*, 8 Ala. 719; *Commonwealth* v. *Callaghan*, 2 Virginia Cases, 460; all cited in the recent case of *Marshall* v. *Baltimore and Ohio Railroad Company*, 16 Howard, 314.

The propriety of the rule which turns a suitor upon such a contract out of court is thus forcibly vindicated by the Supreme Court of the United States in the case just referred to: "Bribes, in the shape of high contingent compensation, must necessarily lead to the use of improper means and the exercise of undue influence. Their necessary consequence is the demoralization of the agent who covenants for them; he is soon brought to believe that any means which will produce so beneficial a result to himself are 'proper means,' and that a share of these profits may have the same effect of quickening the perceptions and warming the zeal of influential or careless members in favor of his bill. The use of such means and such agents will have the effect to subject the State governmants to the combined capital of wealthy corporations, and produce universal corruption, commencing with the representative and ending with the elector. Speculators in legislation, public and private—a compact corps of venal solicitors, vending their secret influences—will infest the capital, of the Union, and of every State, till corruption shall become the normal condition of the body politic, and it will be said of us as of Rome, '*omne Romæ venale.*'"

The defendants can even be heard to plead, as they have done, that a contract into which they have voluntarily entered is *contra bonos mores;* for the authorities make this an exception to the general rule *nemo allegans suam turpitudinem est audiendus*, an exception founded upon the necessity of the case, and the paramount interest of the public.

But in this instance the infirmity which taints the alleged obligation is patent upon the record, and it would have been the duty of the court, even had no such exception been pleaded, to notice *ex officio* and to discountenance any attempt to enforce, by the authority of justice, a contract which is reprobated by morality and law.

Judgment affirmed.