THE CHIPPEWA VALLEY & SUPERIOR RAILWAY COMPANY, Respondent, vs. THE CHICAGO, ST. PAUL, MINNEAPOLIS & OMAHA RAILWAY COMPANY, imp., Appellant.

*November 9 — December 3, 1889.*

*Contracts for lobbying: Public policy: Construction of statutes.*

1. A contract by which one railway company agrees not to make any effort to procure a land-grant from the legislature, and to render to another company " all the reasonable and proper assistance

which it may be able to give" in procuring such grant, upon the contingent consideration of receiving from the latter company a portion of the land, is void as against public policy.

2. Where it was understood at the time of making such contract that the company agreeing to render such assistance represented a third company as well as itself, a second contract, substituted for the former one, including such third company as a party but otherwise substantially the same as the former contract and made without any other consideration, is equally void, although executed after the legislature had granted the lands to the company which was to be aided in obtaining the same.

3. The words "any person" in sec. 4482, R. S., include any corporation.

APPEAL from the Circuit Court for *Dane* County.

The following statement of the case was prepared by Mr. Justice CASSODAY:

The amended complaint, in effect, alleges the incorporation and organization of the plaintiff, usually called the "*Chippewa Company*," on June 15, 1881. That thereupon the work of locating and constructing its railway was commenced and prosecuted until the fall of 1882, when the same was completed from the Mississippi to Eau Claire, with a branch from near the mouth of the Red Cedar river by way of Menominee to Cedar Falls, and from that time the same has been operated as a railway company engaged in the business of a common carrier. That the defendant the *Chicago, St. Paul, Minneapolis & Omaha Railway Company*, usually known as the "*Omaha Company*," was organized during all the times hereinafter mentioned. That June 15, 1881, it was the owner, among other things, of a railway extending from Elroy, through Eau Claire, to Hudson, and thence to St. Paul. That it was also the owner of a railway from Hudson, in a northeasterly direction, a distance of about 120 miles, known as the "North Wisconsin Railway." That June 15, 1881, the defendant the Chicago, Milwaukee & St. Paul Railway Company, usually known as the "St. Paul Company," was engaged in oper-

ating railways in the states of Wisconsin, Illinois, Minnesota, and Iowa, and the territory of Dakota. That one of its lines extended from La Crosse, by way of Wabasha in Minnesota, to St. Paul. That about 3,000 miles thereof was in the states of Minnesota and Iowa and the territory of Dakota, constructed over prairie lands almost entirely destitute of timber and lumber. That said *Chippewa Company* was organized by parties interested in and friendly to the St. Paul Company, with a view of connecting the lines of said last-named company with the extensive prairies and timber lands in northwestern Wisconsin, and of reaching the ports of Lake Superior, and connecting them with said system of railways, and operating the same in connection with the St. Paul Company, and eventually transferring the same to the St. Paul Company, to be made a part of and be operated with it as a part of its system. That with that view it determined to and did construct said Chippewa Railway. That arrangements were made by said company for the extension of said railway from Cedar Falls, on this route, to Lake Superior, passing over the line of that part of the land grant hereinafter mentioned, more particularly from Superior to the point of intersection at or near Veazie with the North Wisconsin Railway. That, at or about the time of the organization of the plaintiff company there was organized a railway company, by the name of the "Chippewa Falls & Northern Railway Company," with the object of constructing a railway from Chippewa Falls in a northerly direction, by way of Chetek, Rice Lake, and said land grant intersection at or near Veazie, and thence, either by its own line or a branch of said *Omaha Company*, to Superior. That that company was organized in the interest of said *Omaha Company*, and by the officers thereof, and controlled and substantially owned by that company. That it proceeded, with the assistance of said *Omaha Company*, to construct its road from Chip-

pewa Falls, on the route indicated, towards Superior. That the *Omaha Company* subsequently and prior to January 10, 1882, acquired the ownership in form of said road so commenced and partially constructed by said company, and is now the owner thereof. That the lines of railway proposed to be constructed by the plaintiff and by the Chippewa Falls & Northern Railway Company and said *Omaha Company* were identical from Chetek northerly to Superior, a distance of about 125 miles.

The complaint further alleges that by the acts of Congress of June 3, 1856, and May 5, 1864, grants of land, described, were made to Wisconsin, among other things, for the construction of a railway from Madison or Columbus, by way of Portage City, to St. Croix, at a point described, and from thence to the west end of Lake Superior, and to Bayfield, upon the conditions named. That March 4, 1874, the legislature of the state accepted said grants, and thereupon granted to the Chicago & Northern Pacific Air-Line Railway Company all the right, title, and interest which the state then had or might thereafter acquire in or to that portion of the lands granted by said acts of Congress as was or could be made applicable to the construction of that part of the railway lying between the points of intersection mentioned and the west end of Lake Superior, upon the express condition that said last-named company should construct, complete, and put in operation that part of its said railway above mentioned as soon as a railway should be constructed and put in operation from Hudson to said point of intersection, and within five years from said last-mentioned date, and should also construct and put in operation a railway from Genoa northerly at the rate of twenty miles per year; which said grant was duly accepted by said last-named company, May 1, 1874. That the name of said last-named company was afterwards, and about 1874, changed to the Chicago, Portage & Superior Railway Company, com-

monly known as the "Portage & Superior Company." That by an act of the legislature of the state approved March 16, 1878, the time limited for the construction and completion of said last-named railway was extended for the term of three years, or to about May 1, 1882. That for more than two years prior to January 10, 1882, a railway had been completed and put in operation from Hudson to said point of intersection, as stated, but that said Portage & Superior Company had not, on or prior to said last-mentioned date, completed or constructed any portion of said land-grant road from said point of intersection to Superior, and had not constructed or put in operation any part or portion of any railway, and was not the owner of any railway whatever. That said last-named company was then wholly insolvent, and unable to complete or build any portion of said land-grant road or put the same in operation, and that it had no means or ability to complete, construct, or operate a railway, and no property of any kind or description. That one Barnes, of New York, was the owner of nine tenths of the *bona fide* stock thereof, and was, January 10, 1882, and for several weeks prior thereto had been, offering to sell his stock entire, with the control of said company and all the franchises thereof, to different parties, especially to the plaintiff and the St. Paul Company and the *Omaha Company*.

The complaint then alleges that it was well understood by all parties that the said land grant would lapse to the state on May 1, 1882. That the plaintiff, in its own behalf and in the interest of the St. Paul Company, and the *Omaha Company*, were both proposing to apply to the legislature for said grant, and were both proposing to construct their line of road over the line of said land-grant road; and, in view of the facts stated, the plaintiff and the *Omaha Company*, respectively, were proposing to ask the legislature to confer said land grant upon them, and thus prevent the

grant from lapsing and reverting to the United States, and thereby be lost to the state. That it was apparent to both parties that in case the plaintiff, aided and assisted by the St. Paul Company, and the *Omaha Company* should enter into a contest before the legislature for that grant, they might defeat each other, and that no disposition of said land grant would be made, and that said road would not be constructed, and that said land grant would probably fail of its object and become forfeited. That it was manifest that only one road from the Chippewa valley, on the line indicated, to Lake Superior, was needed by the public for the transaction of business, and that, if an arrangement could be made by which both the companies interested could have traffic arrangements over the road to be constructed, all parties would be better accommodated and all interests better subserved than by the construction of two parallel and competing lines. That in view of the situation, and on January 10, 1882, said companies met, by their respective representatives and officers, and entered into a contract in due form of law, in the words and figures, omitting signatures, following:

"This agreement, made this 10th day of January, in the year A. D. 1882, between the *Chicago, St. Paul, Minneapolis & Omaha Railway Company*, party of the first part, and the Chicago, Milwaukee & St. Paul Railway Company, party of the second part, witnesseth, the party of the first part, in consideration of the agreements of the party of the second part hereinafter expressed, agrees: (1) That in case the party of the first part shall obtain the land grant heretofore granted to the Chicago, Portage & Superior Railway Company in the state of Wisconsin, either by grant of the legislature or negotiation with the said Chicago, Portage & Superior Railroad Company, or by both such grant and negotiation, the said party of the first part will give to the said party of the second part one equal fourth

part of the lands received under said grant. (2) That it will grant to said party of the second part all rights, franchises, and property which it may obtain from the said Chicago, Portage & Superior Railway Company south of the junction of said road with the main line of the North Wisconsin Railway, including all grade and right of way of said company between said junction and the city of Chicago, which the party of the first part may acquire. (3) That it will make a contract of lease with the said party of the second part, giving said party of the second part an equal right with the party of the first part to run its trains from Chippewa Falls (or, if the party of the first part shall construct a road from Eau Claire to Chippewa Falls, then from Eau Claire by way of Chippewa Falls) to Superior City, upon the following terms: The party of the second part shall pay to the party of the first part six per cent. interest per annum upon one half of the actual cost, upon a cash basis, of said railroad, and shall also pay for repairs of the same upon the same, upon the basis of wheelage. The option to take this agreement of lease shall remain to the party of the second part for the term of six months from the time the road is completed so as to admit of the running of trains through from Chippewa Falls to Superior City.

"The party of the first part further agrees that it will not extend its Neillsville line, and both of the parties hereto agree that they will not extend their lines into the territory between Beaver, on the Wisconsin Valley Railroad; Neillsville, on the *Chicago, St. Paul, Minneapolis & Omaha Railroad;* Abbotsford, on the Wisconsin Central Railroad,— without a further agreement between them.

"In consideration of the above agreement, the said party of the second part hereby agrees that it will not make any efforts to procure said lands to be granted to it, or aid or assist any other party to procure the same, except the said

AUGUST TERM, 1889.          231

Chippewa Valley & S. R. Co. vs. Chicago, St. P., M. & O. R. Co.

party of the first part, and that it will render to said party of the first part all reasonable and proper assistance which it may be able to give in procuring said land grant to be given to the said party of the first part by the legislature, and will aid said party of the first part in any negotiation that it may set on foot with the said Chicago, Portage & Superior Railroad Company for the purpose of acquiring the same.

"It is further agreed and understood that in case it shall become necessary to pay the said Chicago, Portage & Superior Railway Company any sum of money in order to procure an assignment of its interest in said grant, that the party of the second part shall pay its proportion of said amount, being as one to three, or relinquish all rights to any portion of said grant. It is further understood and agreed that the question of the amount of land pertaining to said grant, and the division thereof between said companies as above provided, shall be left to the determination of Philetus Sawyer and Alexander Mitchell, and that the decision upon that subject shall be final and conclusive between the parties.

"In testimony whereof the parties to these presents have caused the same to be executed by their respective presidents, and their corporate seals to be affixed hereto, attested by their respective secretaries, the day and year first above written."

The complaint then alleges that said contract was in fact executed by the St. Paul Company in its own behalf and as representing the plaintiff. That the plaintiff and the St. Paul Company, in good faith, relying upon the agreements of said *Omaha Company* in said contract contained, made no application to the legislature, then just convening, to have said land grant conferred upon the plaintiff, and ceased all negotiations then pending between the plaintiff and said Portage & Superior Company, and between the St. Paul

Company and said Portage & Superior Company, for the purchase of the stock and property of said company, and rendered to said *Omaha Company* all such reasonable and proper assistance as they were able to give in the negotiations between it and said Portage & Superior Company for the purchase of said grant. That immediately after the making of said contract the *Omaha Company* renewed its negotiations with the Portage & Superior Company, or the agents of said Barnes, for the purchase of said stock, property, and rights thereof. That said negotiations soon thereafter resulted in such purchase. That the actual transfer of said stock, after said negotiations were completed, was, by the direction of the *Omaha Company*, made to one Cable, a friend of said company, who took the transfer thereof to himself, in his own name, but for the benefit of the *Omaha Company*. That the whole consideration therefor was paid to Barnes by the *Omaha Company*. That subsequently Cable transferred all of said stock to the *Omaha Company* or to some other person for its benefit. That, as such owner, the *Omaha Company* consented to the legislation thereafter procured, resuming said land grant to the state and conferring the same upon the *Omaha Company*. That, in consequence thereof, no objection was made by the Portage & Superior Company, or the parties entitled to represent the same, but they in fact consented thereto. That, immediately after said purchase, the *Omaha Company* applied to the legislature to resume said grant from said Portage & Superior Company, and to confer the same upon the said *Omaha Company*, and prepared a bill for that purpose, which was introduced in the legislature and passed, the same being chapter 10 of the Laws of 1882, approved February 16, 1882. That in and by said act the legislature revoked and annulled the said land grant theretofore held by the Portage & Superior Company, and conferred the same upon and granted it to the *Omaha Company*, with all the

right, title, and interest which the state then had or might thereafter acquire in and to the lands granted to said state by said acts of Congress to aid in the construction of such railway, which were applicable under said acts to the construction of that portion thereof which lay between the west end of Lake Superior and said point of intersection. That said grant was upon the express condition that the *Omaha Company* should continuously proceed with the construction of the railway then in part constructed by it between said point of intersection and the west end of Lake Superior, and should complete the same so as to admit of the running of trains thereover on or before December 1, 1882; and upon such completion the *Omaha Company* became entitled to patents for all lands applicable under said acts to the land-grant road so constructed. That in making such purchase and the passage of said act the St. Paul Company and the plaintiff, in pursuance of the contract above set forth, rendered to the *Omaha Company* all such reasonable and proper assistance as they were able to give in the premises, and the St. Paul Company and said plaintiff in good faith in all respects observed, performed, and to their utmost ability carried out the terms and provisions of said contract. That thereby said grant was conferred upon the *Omaha Company*.

The complaint further alleges that June 10, 1882, and while the *Omaha Company* was engaged in constructing said railway, the St. Paul Company and the plaintiff applied to the *Omaha Company*, and requested that said contract so executed January 10, 1882, should be so changed as to make the plaintiff a party thereto, to which said *Omaha Company* consented; and thereupon a tripartite contract was prepared between them and executed, making the *Omaha Company* party of the first part, and the St. Paul Company party of the second part, and the plaintiff party of the third part, and dated as of January 10, 1882.

That by the contract so modified the *Chippewa Company* was thereby entitled to the benefits of the first, third, and part of the fourth subdivisions of the contract, and the St. Paul Company the benefits of the second and part of the fourth subdivisions. That otherwise said second contract was a copy of the first. That at the same time, and in consequence thereof, the contract so made January 10, 1882, was surrendered and canceled.

The complaint further alleges that prior to December 31, 1882, the *Omaha Company* constructed such railway between said point of intersection and the west end of Lake Superior, a distance of about sixty-two miles, and completed the same so as to admit of the running of trains over the same, on or before December 1, 1882, and thereby became entitled to the land so granted to it by ch. 10, Laws of 1882, and entitled to receive patents therefor. That said lands amounted to about 400,000 acres, which were so granted to the *Omaha Company*, and the same were mostly covered with a heavy growth of pine and other valuable timber, and were, at the time of said last-named grant, of the value of $2,000,000 and over. That during 1882 the *Omaha Company* also constructed a line of railway, formerly known as the "Chippewa Falls & Northern," but now as a part of the *Omaha Company's* lines, from said Chippewa Falls to within about ten miles from the said point of intersection, and prior to June 1, 1883, the *Omaha Company* completed such line or road to Veazie, the said point of intersection. That on June 1, 1883, the said railway was completed from Chippewa Falls to Superior, so as to admit of the running of trains through thereon. That, on or about May 1, 1883, the *Omaha Company* commenced the construction of a line from Chippewa Falls to Eau Claire, and has nearly completed the same, and the same will be ready for the running of trains thereon, on or before September 1, 1884. That when completed it will form a

AUGUST TERM, 1889.                235

Chippewa Valley & S. R. Co. vs. Chicago, St. P., M. & O. R. Co.

continuous line of railway from Eau Claire, by way of Chippewa Falls, to Superior, completing the *Omaha* road. That the *Omaha Company* has received such patents, or claims the right to the same, and has sold and disposed of a large amount of the lands so patented, and parted with the title thereof to third parties, unknown to the plaintiff. That it has also sold and disposed of a large quantity of the timber on said lands to various parties, who have taken and converted the same to their own use. That the plaintiff has in all respects kept and performed, or offered to perform, each and all the conditions and terms of said last-named contract to be kept and performed by it. That the plaintiff had notified the *Omaha Company* that it had elected to take the contract or lease mentioned in the contract, but that the *Omaha Company* has hitherto refused, and still refuses, to inform the plaintiff of such amounts, or any of them, and does refuse to convey to the plaintiff any part of said lands, and does refuse to grant unto the plaintiff any contract or agreement giving to the plaintiff an equal right with the *Omaha Company* to run its trains as specified in the contract, and has utterly refused to carry out or comply with the terms of said contract on its part.

The complaint prays the specific performance of said second contract, and for an accounting and injunction.

To that complaint the *Omaha Company* demurred on the ground that it did not state facts sufficient to constitute a cause of action, and from the order overruling such demurrer the *Omaha Company* appeals.

For the appellant there was a brief by *S. U. Pinney*, and oral argument by *Mr. Pinney* and *C. M. Osborn*. They argued, among other things, that the contract is void as against public policy — 1. Because, *as a matter of law*, it is void on account of its manifestly corrupt and unlawful *tendency*, irrespective of the question whether anything wrong was intended or accomplished, that was either improper or

illegal. *Collins v. Blantern,* 1 Smith's L. Cas. 716, and notes 741–765; *Fuller v. Dame,* 18 Pick. 472; *Clippinger v. Hepbaugh,* 5 Watts & S. 315; *Marshall v. B. & O. R. Co.* 16 How. 314; *Bryan v. Reynolds,* 5 Wis. 200; Pollock Cont. 337–8, 381; *Holland v. Hall,* 1 Barn. & Ald. 53; *Allkins v. Jupe,* L. R. 2 C. P. Div. 375; *Richardson v. Crandall,* 48 N. Y. 362; *Atcheson v. Mallon,* 43 id. 147; *Lyon v. Mitchell,* 36 id. 238; *Mills v. Mills,* 40 id. 543; *Providence Tool Co. v. Norris,* 2 Wall. 45, 55; *Trist v. Child,* 21 id. 441; *Filson's Trustees v. Himes,* 5 Pa. St. 456; *Bowers v. Bowers,* 26 id. 74; *Noel v. Drake,* 28 Kan. 265; *Lucas v. Allen,* 80 Ky. 681; *Gulick v. Ward,* 10 N. J. Law, 87, 185; *Bollman v. Loomis,* 41 Conn. 581; *Harrington v. Victoria Graving Dock Co.* L. R. 3 Q. B. Div. 549; *Meguire v. Corwine,* 101 U. S. 108; *Oscanyan v. Arms Co.* 103 id. 261, 269; *Egerton v. Brownlow,* 4 H. L. Cas. 1; *Woodstock Iron Co. v. Richmond & D. Extension Co.* 129 U. S. 643, 662. The illegality from public policy cannot be waived. *Cardoze v. Swift,* 113 Mass. 250; *Wright v. Rindskopf,* 43 Wis. 348; *Oscanyan v. Arms Co.* 103 U. S. 267. No agreement of the parties in parol can aid a written instrument fraudulent and void in law, or illegal on its face. *Blakeslee v. Rossman,* 43 Wis. 124; *Wood v. Lowry,* 17 Wend. 492; *Edgell v. Hart,* 9 N. Y. 213; *Robinson v. Elliott,* 22 Wall. 513; *Fuller v. Dame,* 18 Pick. 479; *Harrington v. Victoria Graving Dock Co.* L. R. 3 Q. B. Div. 549; *Atcheson v. Mallon,* 43 N. Y. 147; *Richardson v. Crandall,* 48 id. 362. 2. Because it is an agreement to pay compensation for lobby services in procuring legislation. 3. Because it was an agreement to pay for the withdrawal of opposition to a proposed legislative measure, and for stifling an existing opposition thereto. *Pingry v. Washburn,* 1 Aikens, 264; *Gray v. Hook,* 4 N. Y. 449; *Gulick v. Ward,* 10 N. J. Law, 78; *Fuller v. Dame,* 18 Pick. 472; *Frost v. Belmont,* 6 Allen, 152, 162; *Atcheson v. Mallon,* 43 N. Y. 147; *Mills v. Mills,* 40 id. 545; *Gibbs v.*

*Smith*, 115 Mass. 592.  4. Because the agreement to compensate the other two companies was contingent upon the passage of the proposed act; and any such agreement is illegal and void, as it would be a strong incentive to the exercise of personal and sinister influences to effect its passage.  *Wood v. McCann*, 6 Dana, 366; *Clippinger v. Hepbaugh*, 5 Watts & S. 313; *Marshall v. B. & O. R. Co.* 16 How. 335; *Providence Tool Co. v. Norris*, 2 Wall. 55; *Meguire v. Corwine*, 101 U. S. 108.

These contentions do not in the least interfere with or deny the right of any party to appear before the legislature or any committee appointed by it, or before any other public body or officer, in person or by agent or attorney paid for that purpose, and in a manner entirely frank, open, and above board, to advocate and urge the allowance of proper claims, or to urge the adoption of any measure of public or private utility or importance.   Smith's L. Cas. (Am. notes), 692; *Bryan v. Reynolds*, 5 Wis. 200; *Wood v. McCann*, 6 Dana, 366; *Wildey v. Collier*, 7 Md. 273.   What they do establish is, that when acts or services of such a character are to be done or rendered, an agreement made for payment to the agent or attorney of a contingent fee therefor would be at variance with good morals and the best interests of society.   Such an agreement will be deemed contrary to public policy, as giving occasion to fraud and corruption, if not actually corrupt.   Smith's L. Cas. (Am. notes), 692; *Sedgwick v. Stanton*, 14 N. Y. 289; *Wildey v. Collier*, 7 Md. 273; *Harris v. Roof's Ex'rs*, 10 Barb. 489; *Rose v. Truax*, 21 id. 361; *Powers v. Skinner*, 34 Vt. 275.

*John W. Cary*, for the respondent, contended, *inter alia*, that the contract as originally made between said companies is valid and not in contravention of public policy.   The court cannot presume that the agreement was to use improper means or influences to accomplish the desired end, but only such as were legal, proper, and right.   There is

nothing in the contract or circumstances attending its making, from which the court can infer or assume that the parties intended to contract for illegal and improper services; but, on the contrary, all such inferences or assumptions are expressly excluded by the terms of the contract, which provides that only " reasonable and proper assistance which it may be able to give," should be afforded. *Lorillard v. Clyde,* 86 N. Y. 384; *Ormes v. Dauchy,* 82 id. 443; *Curtis v. Gokey,* 68 id. 300; *Kling v. Fries,* 33 Mich. 275; *Beal v. Polhemus,* 67 id. 130; *Norton v. Kearney,* 10 Wis. 443; *Denison v. Crawford Co.* 48 Iowa, 211. Although a contract is admittedly against public policy and could not be enforced, yet where parties have acted under it and made gains or acquired property which is in the hands of one of the parties, a *court of equity* will compel him to account to the other party for his interest therein; and where, in such a case, the parties themselves, after acquiring benefits or property in pursuance of such void contract, which is in the hands of one of said parties, come together and make a settlement or agreement in relation thereto and the disposition thereof, such last agreement will be enforced by a court of equity, and the party having such property will be held to account for it to the other party in pursuance of such last agreement, notwithstanding the original contract was void as against public policy. *Planters' Bank v. U. S. Bank,* 16 Wall. 483, 499, 500; *Brooks v. Martin,* 2 id. 70; *Heckman v. Swartz,* 50 Wis. 267, 270; *Sharp v. Taylor,* 2 Phill. Ch. 801; *Anderson v. Moncrief,* 3 Desauss. 126; *Bousfield v. Wilson,* 16 Mees. & W. 185; *Owen v. Davis,* 1 Bailey, 315; *Gilliam v. Brown,* 43 Miss. 641; *De Leon v. Trevino,* 49 Tex. 88.

Cassoday, J. This action is brought to enforce the specific performance of the contract or contracts set forth in the foregoing statement. By virtue of those contracts the

plaintiff claims the right to the equal undivided one-fourth of all the lands and the avails thereof granted to the state for the purpose of aiding in the construction of a railroad from Superior to the junction near Veazie,— a distance of about sixty-two miles,— and said to contain 400,000 acres of land, of the value of $2,000,000. The state granted all of those lands to the Portage & Superior Company in 1874, for the purpose named and upon the conditions set forth in said statement; and that company continued to hold the same down to the time of executing the first of said contracts, January 10, 1882. It had failed, however, to construct any portion of the sixty-two miles of road between Superior and the junction, as required by such grant, and it had also failed to construct any portion of the road from the state line at Genoa to said junction, as required by such grant. It was, moreover, then insolvent and wholly unable to complete any part of either of such roads, and the owner of nine tenths of the *bona fide* stock of that company was then offering to sell the same to different parties, and particularly to the *Chippewa*, St. Paul, and *Omaha* Companies, respectively. The fact of such insolvency and default on the part of the Portage & Superior Company, and the further fact that the time limited in the grant for its completion of the entire road would expire about May 1, 1882, had, prior to the execution of the contract, January 10, 1882, induced the *Chippewa Company*, in its own behalf and in the interest of the St. Paul Company, and the *Omaha Company*, respectively, to apply to the legislature, then about to convene, for said grant, and to ask that the same be conferred upon its company; but in view of the fact that should these companies, respectively, enter into a contest before the legislature for such grant, they might thereby defeat each other and prevent any disposition of the same, it was deemed advisable by them to enter into an arrangement whereby such conflicting interests should be harmon-

ized, and but one road constructed over the proposed route, with running arrangements for both, as set forth in the statement made.    To secure such objects, the written contract of January 10, 1882, was made and executed as stated; and thereupon, and in pursuance of said contract, the *Chippewa* and St. Paul Companies ceased all negotiations for the purchase of said stock, and made no application to the legislature for said grant, and rendered to the *Omaha Company* " all such reasonable and proper assistance as they were able to give in the premises," and " in good faith in all respects observed, performed, and to their utmost ability carried out, the terms and provisions of said contract; " and the *Omaha Company* was thereby enabled to purchase said stock and obtain said grant from the legislature by virtue of ch. 10, Laws of 1882.    The contract executed June 10, 1882, was a substantial copy of the one executed January 10, 1882, including dates, except as set forth in the foregoing statement.

The validity of ch. 10, Laws of 1882, has recently been challenged, on the ground that the grant to the Portage & Superior Company in 1874 gave to that company the right to earn the land therein granted, and was in the nature of a contract, which the state legislature could not impair, and also upon the ground that the legislature passing the act had been influenced or misled by false representations made to its members respecting the intentions, financial condition, etc., of the Portage & Superior Company.    The conclusions reached by Mr. Justice HARLAN, in an elaborate and well-fortified opinion, were to the effect that the question of such undue influence and misrepresentation was not one to be determined by courts or juries upon evidence; and that, assuming the act to have been unconstitutional and void as impairing the obligations of contracts, yet after the time for constructing the road by the Portage & Superior Company had fully transpired, the legislature had confirmed

such revocation and resumption of the grant, and the conferring of the same upon the *Omaha Company* by ch. 29, Laws of 1883. *Farmers' L. & T. Co. v. C., P. & S. R. Co.* 39 Fed. Rep. 143. In this case, however, we must assume what counsel on both sides have assumed, that ch. 10, Laws of 1882, was a valid grant to the *Omaha Company.* The right of the Portage & Superior Company was, at most, nothing more than *to earn the lands* granted, upon the terms specified therein.

The important question here presented for consideration is whether the agreements contained in the second contract, and here sought to be specifically enforced, are valid. We are all agreed that the validity of that contract stands upon the same basis as the first, since it was made without any other consideration and is substantially the same as the first, so modified as to include the *Chippewa Company* as a third party, as it was understood in the negotiations and at the time of making the original contract that the St. Paul Company in fact represented the *Chippewa Company* as well as itself. Especially would this be so if the *Omaha Company* is forced to rely for its title upon the act of 1883 instead of the act of 1882, as suggested in the case cited. The only considerations for the agreements here sought to be enforced are such as are specified in the fourth subdivision of each of the contracts. The mere option given in the third subdivision cannot be regarded as a consideration — much less a separate and independent consideration. The clause therein to which the arguments have mainly been directed, as found in the second contract, reads as follows:

"In consideration of the above agreements, the said parties of the second and third part hereby agree that they will not make any effort to procure said lands to be granted to them, or either of them, or aid or assist any other party to procure the same, except the party of the first part, and that they will render to said party of the first part all rea-

sonable and proper assistance which they may be able to give in procuring said land grant to be given to the party of the first part by the legislature, and will aid said party of the first part in any negotiations which it may set on foot with the said Chicago, Portage & Superior Railroad Company for the purpose of acquiring the same."

The able and learned counsel for the plaintiff insists that the presumption is always in favor of the legality of contracts, and hence that the "effort," "aid," "assistance," and services thus agreed to be made, rendered, and performed must be regarded as such only as were not illegal, improper, or vicious; and then it is assumed that if such effort, aid, assistance, and services were lawful in themselves, then it was competent for the *Chippewa* and St. Paul Companies, respectively, to contract with the *Omaha Company* to make, render, and perform the same. In support of this contention, the same counsel suggests numerous things which the *Chippewa* and St. Paul Companies, respectively, might innocently have done under the contract. Among these, it is claimed that such company, " or what is the same thing, its managing officers," might legally and properly have refrained from negotiating for or the purchase of said stock or the property of the Portage & Superior Company, and advised the parties in charge thereof to negotiate with the *Omaha Company;* that it was competent for such company or its managing officers to have stated, "either publicly or privately to its friends either in or out of the legislature, that its interests would be advanced by granting the *Omaha Company's* application for said grant;" or have stated " to any of its friends, or any member of the legislature, that if the grant was made to the *Omaha Company* it would have the effect of extending " its "lines or the right to run on the *Omaha* road to Lake Superior;" or expressed "its opinion and desire and wish that this grant should be made to the *Omaha Company*."

The fallacy of this contention, if fallacy it be, consists in assuming that, if these several things were not in themselves a violation of law or good morals, then it was competent for the *Omaha Company*, in consideration thereof, to legally bind itself by the agreement in question to the effect that, in case of its obtaining the land grant, it would give "one equal fourth part" thereof, also the "right, franchises, and property" of the Portage & Superior Company and the "contract of lease" therein mentioned, as therein specified.  In an action on a contract not to prosecute a criminal, the most eminent English judge who never reached a higher position than chief justice of the common pleas, unless by declining to be made Lord Chancellor, approvingly quotes a text-writer, to the effect that a person could not bind himself legally by a " promise to pay money to a man not to do a crime." *Collins v. Blantern*, 2 Wils. 350. A few years later, Lord MANSFIELD, C. J., in behalf of the King's Bench, said: " Many contracts which are not against morality are still void as being against the maxims of sound policy."  A third of a century ago this court, while conceding that an agreement for compensation for certain services in securing the passage of an act, as, for instance, making a public argument before a committee of the legislature, or before the legislature itself if permitted to do so, might be enforced, nevertheless held that " an agreement to prosecute and superintend, in the capacity of agent and attorney, a private claim before the legislature, is against public policy and void, and no action can be maintained thereon, or for services thus rendered." *Bryan v. Reynolds*, 5 Wis. 200; *S. C.* 68 Am. Dec. 55.  " To prosecute and superintend my claim for certain services, as contractor to the state, for the construction of the Portage canal," were the words of the written contract.  It contained, however, the provision that " such claim to be brought before the legislature in such mode and manner as my said agent and.

attorney may choose to have the same presented;" and the compensation therein agreed upon was ten per cent. on the whole amount which the state might allow.    In deciding the case, WHITON, C. J., speaking for the whole court, including the present chief justice, said: "We know of no way by which a person who is not a member of the legislature can prosecute or superintend a claim before that body, except by means of the members themselves, or some of them.    He could not, therefore, comply with the contract on his part without resorting to personal solicitation with the members of the legislative body.    We therefore think that the contract was, by its terms, an agreement to pay money for a consideration which is inconsistent with public policy, and that the agreement is for that reason void."    The learned counsel for the plaintiff insists that the case was wrongly decided, and we are asked to reconsider and overrule it, or, at least, distinguish it from the case at bar.    It is certainly inconsistent with counsel's theory of the presumptive legality of such contracts.    Upon that theory, the "mode and manner" of presentation, prosecution, and superintendence might have been confined to such services as might have been legally contracted for.

It is true, the learned chief justice writing that opinion only cited two adjudications in support of the conclusions reached; but those cases have frequently been sanctioned by other courts, and he certainly might have cited others which had been previously made, sanctioning the same principles.    *Fuller v. Dame*, 18 Pick. 472; *Hatzfield v. Gulden*, 7 Watts, 152, 32 Am. Dec. 750; *Clippinger v. Hepbaugh*, 5 Watts & S. 315, 40 Am. Dec. 519; *Filson's Trustees v. Himes*, 5 Pa. St. 452, 47 Am. Dec. 422; *Harris v. Roof's Ex'rs*, 10 Barb. 489; *Marshall v. B. & O. R. Co.* 16 How. 314; *Wildey v. Collier*, 7 Md. 273, 61 Am. Dec. 346; *Rose v. Truax*, 21 Barb. 361.    Besides, the case of *Bryan v. Reynolds*, 5 Wis. 200, has been expressly sanctioned in well-con-

sidered opinions by at least three courts of high authority. *Powers v. Skinner*, 34 Vt. 274, 80 Am. Dec. 677; *Elkhart Co. Lodge v. Crary*, 98 Ind. 238, 49 Am. Rep. 746; *Sweeney v. McLeod*, 15 Oreg. 330. The case of *Bryan v. Reynolds*, *supra*, has also been cited approvingly in *Melchoir v. McCarthy*, 31 Wis. 254.

In the leading case of *Fuller v. Dame, supra*, the acts to be done, and for which the owner of certain lands was to pay a compensation, were the getting up of a joint-stock company, the purchase of such lands, and the procuring of a terminal depot to be located and constructed thereon by a railroad company. Such cases are undoubtedly regarded as analogous in principle to an agreement to pay compensation for procuring legislation. In that case there was no stipulation for secrecy, much less for publicity, and counsel invoked the same presumption of innocence which is here contended for. In considering it, SHAW, C. J., said: "It was strongly pressed by the counsel for the plaintiffs that when a contract is made in general terms, broad enough to include things lawful and unlawful, it shall be presumed that they intended those only which were lawful. . . . The law goes further than merely to annul contracts where the obvious and avowed purpose is to do or cause the doing of unlawful acts. It avoids contracts and promises made with a view to place one under wrong influences,— those which offer him a temptation to do that which may injuriously affect the rights and interests of third persons." He then illustrates how a person might lawfully solicit a bequest or devise in favor of a friend, or 'lawfully propose a marriage, but that " any promise of reward made to him to induce him to do this, or any promise made afterwards in consideration of such service, would be void. This is founded upon the general consideration of fitness and expediency. Such advice and solicitation, in whatever form the agency may be exerted, are understood to be disinter-

ested, and to flow from a single regard to the interests of the parties. *They are lawful only so far as they are free and disinterested.* If such advice and solicitation, thus understood to be pure and disinterested, may be justly offered from mercenary motives, they would produce all the consequences of absolute misrepresentation and falsehood."

In *Trist v. Child*, 21 Wall. 441, similar illustrations were made, and it was held that " a contract to take charge of a claim before Congress, and prosecute it as an agent and attorney for the claimant, . . . is void." Then, after distinguishing such a contract from one for purely professional services, the court held: " 6. Though compensation can be recovered for these [professional services] when they stand by themselves, yet when they are blended and confused with those which are forbidden the whole is a unit and indivisible, and that which is bad destroys the good; " and hence " compensation can be recovered for no part." To the same effect is *Meguire v. Corwine*, 101 U. S. 112. In *Wildey v. Collier*, 7 Md. 273, the agreement for compensation, sought to be enforced, was for procuring favorable action of the governor; but it was held void as against public policy. The court said: " The reasons are obvious. They are designed to protect the exercise of this power from abuse through the intervention of designing persons, and, although in the particular instance no improper influences may have been resorted to, the public interest in such questions requires that the principle should be enforced in all cases. . . . The same reason applies with equal force in support of claims for obtaining the passage of laws by the legislature." In the case of *Clippinger v. Hepbaugh*, 5 Watts & S. 315, it was said by the court: " It matters not that nothing improper was done or was expected to be done by the plaintiff. It is enough that *such is the tendency of the contract;* that it is contrary to sound morality and public policy, leading necessarily, in the hands of designing and

corrupt men, to improper tampering with members, and the use of an extraneous secret influence over an important branch of the government. It may not corrupt all; but if it corrupts *or tends* to corrupt some, or if it deceives or *tends* to deceive or mislead some, that is sufficient to stamp its character with the seal of reprobation before a judicial tribunal." In *Rose v. Truax*, 21 Barb. 361, the contract under which compensation was sought was merely "to use his influence, efforts, and labor in procuring the passage of a law by the legislature;" but it was held to be void as against public policy, and, as the contract was entire, it was wholly void, and hence no recovery could be had either upon the contract or *quantum meruit,* even for legitimate services. To the same effect as the above cases are *Mills v. Mills,* 40 N. Y. 543, 100 Am. Dec. 535; *Frost v. Belmont,* 6 Allen, 152; *McKee v. Cheney,* 52 How. Pr. 144; *Gil v. Williams,* 12 La. Ann. 219; *Usher v. McBratney,* 3 Dill. 385; *Providence Tool Co. v. Norris,* 2 Wall. 45; *Oscanyan v. Arms Co.* 103 U. S. 261; *Woodstock Iron Co. v. Richmond & D. Extension Co.* 129 U. S. 643.

In speaking of the principle applicable to an agreement for compensation for procuring a contract from the government, in *Providence Tool Co. v. Norris,* 2 Wall. 45, Mr. Justice FIELD tersely observed: "It [such principle] has been asserted in cases relating to agreements for compensation to procure legislation. These have been uniformly declared invalid, and the decisions have not turned upon the question whether improper influences were contemplated or used, but upon the corrupting tendency of the agreements." 2 Wall. 54. On another page he states: "It is sufficient to observe, generally, that all agreements for pecuniary considerations to control the business operations of the government, or the regular administration of justice, or the appointments to public offices, *or the ordinary course of leg-*

*islation,* are void as against public policy, *without reference to the question* whether improper means are contemplated or used in their execution. The law looks to the general tendency of such agreements, and it closes the door to temptation by refusing them recognition in any of the courts of the country." 2 Wall. 56. These principles are reasserted by the same learned justice in *Oscanyan v. Arms Co.* 103 U. S. 261, 264.

In the case at bar it is urged that the efforts to be made, the aid and assistance to be given, and the services to be rendered were expressly limited by the contract to such as were "reasonable and proper." In *Marshall v. B. & O. R. Co.* 16 How. 314, the proposed plan of Marshall, which was the basis of the contract under which he claimed compensation for the services rendered, contained this clause: "I contemplate the use of no improper means or appliances in the attainment of your purpose. My scheme is to surround the legislature with respectable and influential agents, whose persuasive arguments may influence the members to do you a naked act of justice. This is all." He then illustrates by mentioning an ex-state senator and ex-presiding officer of that body. 16 How. 318. So in *Elkhart Co. Lodge v. Crary,* 98 Ind. 238, the stipulation was only for the use of "all proper persuasion." So in *Sweeney v. McLeod,* 15 Oreg. 330, the stipulation was merely that the plaintiff would, " by means of all *legitimate importunity* and submission of evidence, to prevent the passage of any law," etc. But none of these stipulations were sufficient to save either of such contracts from the condemnation of the respective courts. Where the principal object and purpose of an agreement is to secure, by a promise of compensation contingent upon success, influence upon or with members of a legislature, or executive or other public official, it is none the less vicious in its tendencies because it is therein stipulated that such

influence shall be "reasonable and proper." The precise point is that such agreement for such purchase of influence is against public policy and therefore improper.

There is another consideration which has generally made courts more emphatic in condemnation of such contracts, and that is that the agreement for compensation is made contingent upon the success of the legislation or other object sought. This is illustrated and held in several of the cases cited. Since it is established that such contingent reward makes such contracts more vicious, it certainly follows that the vice becomes more enormous as the amount of the reward is increased. In the case at bar the share of the land grant contracted for is alleged to be half a million dollars — to say nothing of the lease and other rights contracted for. If such contract for one fourth of the grant is valid, then upon the same principle, we assume, it would be claimed to be valid if it had been for three fourths or even nine tenths of the grant.

In bestowing the grant the legislature were executing a trust imposed upon the state by Congress. The legislature had no power to pervert that trust, nor any part of it, even for the benefit of the state, much less for the benefit of a railway corporation upon which no part of the grant had ever been conferred, and which owed no duty in the construction or operation of the road in aid of which it was granted. The object of such grant was not only to aid in such construction, but to insure its continued operation. But to sanction such a contract so perverting one fourth of the grant might, in a supposed case, leave the constructing company insolvent and without any ability to successfully operate the road. Since the intention of the legislature is only ascertainable from the grant itself, it necessarily follows that they intended to bestow the grant on the *Omaha Company* alone. To sanction the contract, therefore, would be to defeat the expressed intention of the legislature, and

to allow the parties to the contract, in advance of the construction of any portion of the road, to parcel out the grant to suit themselves, when, as a matter of fact and law, the trust could only be executed by the legislature itself in the name of the state as a naked trustee acquiring all its power to act at all directly from Congress.

Of course, it was competent for either of these corporations to refrain from applying to the legislature for the grant, but the reasons already given, as well as the authorities here cited, preclude any binding contract for such compensation for so refraining. It has frequently been held that such a contract is against public policy, and therefore void. *Pingry v. Washburn*, 1 Aik. 264, 15 Am. Dec. 676; *Gulick v. Ward*, 10 N. J. Law, 87, 18 Am. Dec. 389; *Gibbs v. Smith*, 115 Mass. 592; *Gray v. Hook*, 4 N. Y. 449; *Atcheson v. Mallon*, 43 N. Y. 147.

Some of the cases cited in this opinion lay stress on the fact that the claimant for compensation was or was not a member of the legal profession. A lawyer, engaged in the business of drawing petitions and bills, collecting and presenting evidence and facts by argument or otherwise before committees or the legislature itself, may undoubtedly contract for compensation for such services. In such cases the attorney openly appears to all as the representative of the interested party, and no one is likely to be deceived as to his motives or representative character. But a non-professional, incapable of rendering such services, stands in a different attitude. If such a person engages to procure or aid in the procuring of the passage of a bill, he necessarily contracts for lobby services. " A person who frequents the lobby of a house of legislation, for the purpose of influencing measures " therein pending, is a " lobby member." Webst. Dict. To " lobby " is for a person, not belonging to the legislature, " to address or solicit members of a legislative body in the lobby or elsewhere away from the house, with

a view to influence their votes." Id. Of course, the *Chippewa Company*, and especially the St. Paul Company, as common carriers, have been of immense service in developing the resources and increasing the value of property in our state. As such common carriers, they were necessarily interested in the creation and successful operation of a new railway like the one in question. They, and their respective officers and employees, as citizens of the state, had the same interest in the enterprise that citizens in general had, and probably more than part of them. Still we are to remember that, at the time of making the first contract, neither of those companies, nor the *Omaha Company*, had any legal right, title, or interest in or to the portion of the land grant in question, and were as strangers to the then proposed legislation. True, either or any other railway company was at liberty to apply for the grant, but the legislature, in its wisdom, was perfectly free to refuse or grant such application. The grant was to the *Omaha Company* alone. Neither of the other companies is in any way connected with it, unless it be by virtue of the contract in question. If, then, they are entitled to any portion of that grant, it is by reason of the agreement therein to make the efforts, give the aid and assistance, and render the services stipulated in procuring said land grant to be given to the *Omaha Company*. But what efforts could they make, what aid or assistance could they give, what services could they render, except such as are justly characterized as lobbying? If one railway company may thus legally contract with another railway company for contingent compensation in consideration of such efforts, aid, assistance, and services, then it may make similar contracts with private individuals, or municipal or other corporations, asking legislative action. If corporations could so legally contract, then it would be competent for individuals to do the same.

We are not stating what is likely to occur, but what would be the probable tendency of sanctioning the validity of such a contract. Besides, the powers of every corporation are limited to such as are expressed in its charter or named in the statutes, and such implied powers as are necessary or convenient to carry into execution those which are thus expressed. It is enough to know that these do not include the making of lobbying contracts for contingent compensation for procuring legislation respecting matters in which such corporation has no more concern than the people generally. In the matter of disposing of land grants, as in all other matters of legislation, it is important to the continued welfare of the state and all its citizens that all improper avenues of approach should be effectually closed. In two of the cases cited, Mr. Justice FIELD, speaking of the duties of members of legislative bodies and public officers, asserts what ought to go without saying, that "all such positions are trusts, to be exercised from considerations of duty and for the public good. Whenever other considerations are allowed to intervene and control their exercise, the trust is perverted and the community suffers." He then declares, in effect, that personal influence in such matters is "not the subject of bargain and sale," that it "is not a vendible article in our system of laws and morals, and the courts of the United States will not lend their aid to the vendor to collect the price of the article." 103 U. S. 273, 274; 2 Wall. 56. These maxims of legislative and official propriety and duty, it is believed, are as old as our government, and it may be safely assumed that they will never be brought into disrepute by the American courts. To properly aid in wielding the sovereign power of a great people, under the sanction of an oath, presupposes freedom from any and all extraneous bias and purchased influence. They imply continued vigilance for

the public weal and the faithful performance of every public duty. In the execution of such official trusts, no favors can be secured and no obligations incurred.

For the reasons given we must hold the contract void.

*By the Court.*— The order of the circuit court is reversed, and the cause is remanded for further proceedings according to law.

### NOTE.

CASSODAY, J. Since filing the foregoing opinion, sec. 4482, R. S., which seems to have escaped the vigilance of the learned counsel on both sides as well as the several members of the court, has come to our notice. It provides, in effect, that any person who shall, directly or indirectly, give or receive, *or agree* to give or receive, or offer to give, " any money or property, or valuable thing, or any security therefor, to any person," for his services, or the services of another, '' in procuring the passage or defeat of any measure before the legislature, or before either house or any committee thereof, upon the contingency or condition of the passage or defeat of such measure," *or who*, having any interest as principal, agent, attorney, or otherwise, " in procuring or attempting to procure the passage or defeat " of such measure, " shall attempt in any manner to influence any member of such legislature for or against such measure, without first making known to such member the real and true interest he has in such measure, either personally, or as such agent or attorney, shall be punished " as therein prescribed. This section was, manifestly, for the more effectual suppression of such acts and agreements, coming, as they do, under the condemnation of the common law, as indicated in the foregoing opinion. It is true, this section does not expressly name corporations, but only " any person." These words, however, must be construed as extending to and including any corporation. Subd. 12, sec. 4971, and subd. 2, sec. 4972, R. S. If it be claimed that the section does not include corporations, and that they are to enjoy the exclusive privilege of giving or receiving, or agreeing to give or receive, or offering to give, money or property for such lobbying services, then such privilege should be limited to such corporations as may be chartered specifically for that purpose; for in that event they would, in the spirit of the latter clause of the section cited, appear in their true character, and thus enable unwary members of the legislature, as well as the public, the better to guard against their approach or to escape their allurements altogether. Since the making of the agreement in question was punishable under the statute cited, it is, of course, idle to contend that it may be specifically enforced in equity notwithstanding.