JOSEPH A. WRIGHT et al.

*v.*

WILLIAM H. FISSELL.

[Decided May 10th, 1921.]

1. Complainants who contracted to use their personal and political influence to obtain contracts from the United States government for the defendant in consideration of one-half the profits on all contracts so procured, were not copartners with the defendant, since they were not to share losses as well as profits, nor were they attorneys, agents or employes, but independent contractors, between whom and the government there was no privity.

2. A contract whereby the defendant, a building contractor, agreed to pay the complainants one-half of the profits on all contracts they might procure for him from the United States government, through the use of "their best efforts, influence and endeavors" with the emergency construction committee of the council of national defence, upon the recommendation of which contracts were awarded by the war department, is void as subversive of the public welfare and against public policy, personal and political influence being the only consideration for it.

———

On bill, &c.

*Mr. James R. Nugent,* for the complainants.

*Messrs. Lindabury, Depue & Faulks (Mr. Josiah Stryker),* for the defendant.

BACKES, V. C.

This bill is for an accounting of the profits made by the defendant in constructing Camp Merritt (Tenafly, New Jersey), under a contract with the federal government, and to recover one-half thereof.

The contract, like others, let by the government during the war for the building of cantonments, was on a cost plus ten per cent. profit basis, and it yielded the defendant approximately

$150,000. The contract was awarded by the war department upon the recommendation of the emergency construction committee of the council of national defence, upon which committee was imposed the duty of investigating the character, capacity and dependability of bidders, and the responsibility of selecting only those of the highest ability and integrity. The defendant, Fissell, trading as Fissell & Company, a contractor and builder of undoubted capacity and eligibility, and a constant but unsuccessful applicant for some of the work, conceived, or, rather, misconceived, the idea that the committee was susceptible to political influence, and that to win a contract he had to secure a political "pull," and to that end sent for the complainant Wright, a lieutenant of the complainant Nugent (Nugent is a power in politics and recognized as the Democratic "boss" of New Jersey), and, after telling him of his plans, and receiving from Wright fulsome assurances of his chief's endowments, a bargain was struck that Wright and Nugent should use their "best efforts, influence and endeavors" to obtain contracts from the United States government, for the defendant, in consideration of which they were to receive one-half the profits on any and all contracts the complainants might procure for him. Headquarters were established in Washington, maintained by Nugent and Fissell, in which Wright was held out as Fissell & Company's representative, and Wright and Nugent, unquestionably, exerted their "best efforts, influence and endeavors" by personal appeal to some of the committee, by the intercession of their personal and political friends in Washington, who were also intimately friendly and influential with at least one member of the committee, and by other channels calculated to bring about results; and, eventually, the defendant was selected to build Camp Merritt. The choice was well merited, and the defendant, Fissell, was in all respects worthy, as was well known, and as his work afterwards proved. The members of the committee, all men of impeccable character and loyal to their office, were actuated by a single purpose—securing the best—and in their selection of Fissell from among thousands of bidders, personal or political pressure played no part. But for all that, the complainants were, to a marked extent, instrumental in bringing about the award. No doubt

other and wholly independent forces vouched for Fissell and helped, but it cannot be denied that the campaign of publicity promoted by the complainants gave Fissell a conspicuous prominence over the multitude of competitors, and had much to do with his selection. Assuming, without deciding, that the complainants performed their part of the contract, is the promise of the defendant enforceable? The complainants were not, as claimed, copartners with the defendant, promoting a common enterprise; they were not to share losses as well as profits, and there was no privity between them and the government. They were not attorneys, agents or employes, nor were they other than independent contractors, dealing with the defendant for half his profits in consideration of their influence, and the enlisted influence of others, with the government's officials. Influence—individual and inspired, personal and political—was the commodity and the only consideration for the contract. Contracts based upon such a consideration are universally condemned as subversive of the public welfare and against public policy, and the reason is obvious, as the authorities show.

In *Tool Company* v. *Norris, 2 Wall. 45*, Norris procured from the United States government a contract for the Tool Company for muskets, through "concentrating influence at the war department"—that is, through letters from persons of supposed influence with the secretary of war, and by personal introduction to the secretary by a United States senator. He was promised, if he succeeded in landing a contract, all in excess of $17 per musket the government would pay. The suit was for an accounting, and in holding the promise to be against public policy and void, Mr. Justice Field, speaking for the United States supreme court, said: "All contracts for supplies should be made with those, and with those only, who will execute them most faithfully, and at the least expense to the government. Considerations as to the most efficient and economical mode of meeting the public wants should alone control, in this respect, the action of every department of the government. No other consideration can lawfully enter into the transaction, so far as the government is concerned. Such is the rule of public policy; and whatever tends to introduce any other elements into the

transaction is against public policy. That agreements, like the one under consideration, have this tendency, is manifest. They tend to introduce personal solicitation, and personal influence, as elements in the procurement of contracts; and thus directly lead to inefficiency in the public service and to unnecessary expenditures of the public funds.

"The principle which determines the invalidity of the agreement in question has been asserted in a great variety of cases. It has been asserted in cases relating to agreements for compensation to procure legislation. These have been uniformly declared invalid, and the decisions have not turned upon the question whether improper influences were contemplated or used, but upon the corrupting tendency of the agreements. Legislation should be prompted solely from considerations of the public good and the best means of advancing it. Whatever tends to divert the attention of legislators from their high duties to mislead their judgments, or to substitute other motives for their conduct than the advancement of the public interests, must necessarily and directly tend to impair the integrity of our political institutions. Agreements for compensation contingent upon success, suggest the use of sinister and corrupt means for the accomplishment of the end desired. The law meets the suggestion of evil and strikes down the contract from its inception."

In *Oscanyan* v. *Arms Co., 103 U. S. 261,* the Turkish consul-general, in New York, through his personal influence with Rustam Bey, a representative of the Turkish government, secured for his government a contract for rifles for the Remington Arms Company, for which the Arms company had agreed to pay him a percentage of the total contract price. The agreement was held to be invalid and unenforceable. Mr. Justice Field again spoke the court's opinion, saying: "But, independently of the official relation of the plaintiff to his government, the personal influence which he stipulated to exert upon another officer of that government was not the subject of bargain and sale. Personal influence to be exercised over an officer of government in the procurement of contracts, as justly observed by counsel, is not a vendable article in our system of laws and morals, and the courts of the United States will not lend their aid to the vendor to col-

lect the price of the article. Numerous adjudications to this effect are found in the state and federal courts. This is true when the vendor holds no official relations with the government, though the turpitude of the transaction becomes more glaring when he is also its officer."

In a recent case in England (*Montefiore* v. *Menday Motor Compenents Co., Ltd.* (*1918*), *Eng. L. Rep.* 2 *K. B. 241*), it appeared that the defendant agreed with the plaintiff that if he would procure an advance of capital (war loan) for it from the English government, it would pay him ten per cent. of the amount so secured and allot him forty shares of its stock. It was shown that the plaintiff was to recommend the defendant, and exercise his influence with servants of the crown, and it was found that the true consideration of the bargain was that the plaintiff should use his position and the value of his good word in favor of the defendant in getting government assistance. In addressing itself to the illegality of the contract, the court said: "A contract may be against public policy either from the nature of the acts to be performed or from the nature of the consideration. In my judgment, it is contrary to public policy that a person should be hired for money or valuable consideration when he has access to persons of influence to use his position and interest to procure a benefit from the government. This was expressly decided by Lord Eldon in *Norman* v. *Cole* (*1800*), *3 Esp. 253*, when he said: 'I cannot suffer this cause to proceed. I am of opinion this action is not maintainable; where a person interposes his interest and good offices to procure a pardon, it ought to be done gratuitously, and not for money; the doing an act of that description should proceed from pure motives not from pecuniary ones.' So long ago as the reign of Edward VI. it was provided by the statute of *5 & 6 Edw. 6, c. 16*, that it was illegal to bargain for any brokerage or money for the transference of an office, or any part of an office, concerning the receipt, controllment or payment of any money or revenues of the crown. And a later statute (*49 Geo. 3, c. 126*) made it a misdemeanor to receive money for any office, place or employment particularly specified in that act. * * * It is well settled that in judging this question one has to look at the tendency of the acts contem-

plated by the contract to see whether they tend to be injurious to the public interest. In my judgment a contract of the kind has a most pernicious tendency. At a time when public money is being advanced to private firms for objects of national safety it would tend to corrupt the public service and to bring into existence a class of persons somewhat like those who in ancient times of corrupt politics were described as 'carryers'—men who undertook for money to get titles and honours for those who agreed to pay them for their influence. See the remarks of Lord St. Leonards in *Egerton* v. *Earl Brownlow (1853)*, *4 H. L. C. 1, 234.*"

Other cases which are in denial of the complainants' right to recover are: *Marshall* v. *Baltimore and Ohio Railroad Co., 16 How. 314; Trist* v. *Child, 21 Wall. 441; Hazelton* v. *Sheckells, 202 U. S. 71; Crocker* v. *United States, 240 U. S. 74; Hayward* v. *Nordberg Manufacturing Co., 85 Fed. Rep. 4; Frost* v. *Belmont, 6 Allen (Mass.) 152; Mills* v. *Mills, 40 N. Y. 543; McCallum* v. *Corn Products Co., 116 N. Y. Supp. 118; Clippinger* v. *Hepbaugh, 5 Watts & S. (Pa.) 315; Elkart County Lodge* v. *Crary, 98 Ind. 238; Chippewa Valley & S. Ry. Co.* v. *Chicago, St. P., M. & C. Ry. Co., 75 Wis. 224; 44 N. W. Rep. 17; Hare* v. *Phaup, 23 Okla. 575; 101 Pac. Rep. 1050; Kaufman* v. *Catzen, 81 W. Va. 1; 94 S. E. Rep. 388; Wood* v. *M'Cann, 6 Dana (Ky.) 366; Gil* v. *Williams, 12 La. Ann. 1219; Kansas Pac. Ry. Co.* v. *M'Coy, 8 Kans. 538; M'Bratney* v. *Chandler, 22 Kans. 692; Rose* v. *Truax, 21 Barb. (N. Y.) 361.*

The cases in New Jersey are *Gulick* v. *Ward, 10 N. J. Law 87; Hope* v. *Linden Park Blood Horse Association, 58 N. J. Law 627; Slocum* v. *Wooley, 43 N. J. Eq. 451,* and *Brooks* v. *Cooper, 50 N. J. Eq. 761.* In *Hope* v. *Linden Park Blood Horse Association,* Chancellor McGill, speaking for the court of errors and appeals, said in part: "It is too well established to admit of question that an agreement which controls or restricts, or tends or is calculated to control or restrict, the free exercise of a discretion for the public good, vested in one acting in a public official capacity, is illegal and so reprobated by the courts that no redress will be given to a party who sues for himself in respect of it." In *Brooks* v. *Cooper,* Mr. Justice Lippincott, for

the court of errors and appeals, said: "Whatever tends to injustice or oppression, restraint of liberty, restraint of legal right; whatever tends to the obstruction of justice, a violation of a statute, or the obstruction or perversion of the administration of the law; whatever tends to interfere with or control the administration of the law as to executive, legislative or other official action, whenever embodied in and made the subject of a contract, the contract is against public policy and therefore void and not susceptible of enforcement. * * * Any contracts which have for their object the influencing the action of public officials are void as against public policy. * * * An agreement whose object or tendency is to influence any officer of the state in the performance of a legal duty, partially or completely, is void. * * * It is distinctly held that an agreement for compensation for procuring a contract from the government of our own, or that of another country, is against public policy and void. * * * All agreements, for financial consideration, to control or influence the business operations of the government, or the appointment of public officers, are void as against public policy, without reference to the question whether improper measures are contemplated or used in their execution. The law looks to the general tendency of such agreements, and it closes the door to temptations by refusing them recognition in the courts. * * * And, so, considerations of the same kind, of inferior moment, apply, whenever the necessary or even probable effect of the contract will be to divert any public servant from the path of duty, or cause favoritism or interest to prevail in the determination of questions which should be examined, with a view to the general good and the just claims of the parties in interest."

The bill will be dismissed, with costs.