BURKE v. WOOD.

(Circuit Court, S. D. Alabama. April 25, 1908.)

No. 1,270.

1. CONTRACT—LEGALITY—EMPLOYMENT TO RENDER SERVICES—"LOBBYIST."

A lobbyist is one who solicits members of a legislative body, in the lobby or elsewhere, with the purpose of influencing their votes, and a contract to render such services, or services which consist in part of lobbying, is void as against public policy, and an action cannot be maintained thereon.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, §§ 586–593.

For other definitions, see Words and Phrases, vol. 4, p. 4201.]

2. SAME—WHAT CONSTITUTES LOBBYING.

Plaintiff brought an action to recover for services rendered under an alleged contract with defendant in effecting or aiding to effect the sale to a city of a waterworks plant. The evidence showed, without contradiction, that during several years after the agreement between the parties plaintiff was very active in the matter, not only using his influence to induce the public to favor the project, but soliciting the mayor and

members of the city council who had power to contract for the property to purchase the same; that he obtained the calling of committee meetings, appeared before the committees; and that it was largely due to his efforts that the council finally made the purchase. *Held,* that the services so rendered were in large part at least those of a lobbyist, and that plaintiff could not recover therefor.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, §§ 586–593.

For lobby services, see note to 29 C. C. A. 446.]

3. NEW TRIAL—GROUND—INSUFFICIENCY OF EVIDENCE TO SUPPORT VERDICT.

Where the evidence offered for the party for whom a verdict is rendered, conceding to it the greatest probative force to which it is fairly entitled under the laws of evidence, is insufficient to support or to justify the verdict. it is the duty of the court to set aside such verdict, and grant a new trial.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, New Trial, §§ 142, 143.]

## On Motion for New Trial.

The defendant moves the court to set aside the verdict and grant a new trial in the above stated cause because the verdict was contrary to the evidence; because the verdict was contrary to the weight of the evidence; because the verdict was contrary to the charge of the court; because the court erred in refusing to give the general affirmative charge for the defendant. The defendant bases his motion mainly on the first and last grounds stated. The plaintiff's suit was for work and labor alleged to have been done by him for the defendant, at the latter's request, from time to time, from the year 1902 to April, 1906, and for which he claimed a large sum of money.

The defenses mainly relied on and urged by the defendant in the trial of the cause were (1) that the work and labor done by the plaintiff, and for which he claims compensation, was done for and on account of the Bienville Water Supply Company, and not for the defendant individually; and (2) that the work and labor which was done by the plaintiff was that of a "lobbyist"; that the services he rendered were "lobby services."

The evidence in the case was substantially as follows: Plaintiff, Burke, on behalf of himself, testified that in December, 1902, he was employed by the defendant, Wood, to carry out his wishes and instructions in connection with the sale of the plant of the Bienville Water Supply Company; that he knew the defendant was practically the general manager of the company, and he was employed to look out for the defendant's interest in the company. He stated that there was no agreement with the defendant about his pay further than that the matter of pay was to be left entirely to the defendant, who said he would do what was right about it. He further testified that he worked from 1902 to 1906, and that the character of work he did was to try to effect the sale of the Bienville Water Supply Company's plant to the city; that he discussed the matter with various people and with members of the council all the time, the mayor and others; that he devoted four or five years at the work whenever he had an opportunity at night or in daytime, and that he "got up the meetings and arranged the bringing about the sale," and that he felt he accomplished it. He stated that he appeared before committee No. 6 of the city council as a representative of the Bienville Water Supply Company; that he, from time to time, corresponded with the defendant, and also wrote some letters to one A. W. McCallum, whom he spoke of as the defendant's clerk and representing him, and that he thought he was secretary of the company. Burke also stated that he one time received from the defendant $860, which was disbursed by him except $240 which he got out of it; that the balance was disbursed; that he meant by "disbursed" having different people to help him; that in his work for the defendant he paid out money, which he called "disbursements"—"giving this man some money and another man some money to help him"—that he "did general work around getting up public opinion to help him to carry out his effort to effect a sale of the water

works"; that his employment was to try to show the council that the city wanted the waterworks and needed them. He said that his "principal work was with the council of the city, and to bring influence to bear on them." He stated that he kept the work up with each succeeding mayor of the city, and each succeeding council down to the time the waterworks were sold, and in that way he was instrumental in bringing about the sale.

A. S. Lyons, a witness for the plaintiff, testified that he was an alderman of the city of Mobile, and was a member of the city council during the period from 1902 to April, 1906; that during that time Mr. Burke rendered services in negotiating the sale of the Bienville Water Supply Company's works to the city, trying to bring the parties together. The witness stated that Mr. Burke was very active, and, further, that he was frank to say that he did not think the purchase would have been made by the city if it were not for Mr. Burke; that he thought he was wholly instrumental, and that, had it not been for him, the city would not have bought the waterworks. Referring to the purchase, the witness said, if Mr. Burke had not interested the city council in the proposition to take it up, the people would never have voted on it at all; that his work and labor was before the council acted on the proposition, and it was to a great degree with the council. John Craft, a witness for the plaintiff, testified that he was a member of the city council in 1902; that Mr. Burke did work looking to the sale of the Bienville Water Supply Company for several years; that he wanted witness to consent as a member of the city council to buy it; that witness was chairman of the water committee known as No. 6; that he finally brought the committee together and Burke came before it; that a resolution was subsequently introduced to bring about the purchase. The witness further testified that Burke was very active, and was after witness all the time, so persistent that at times the witness thought he was a nuisance. Jos. H. Norville, a witness for the plaintiff, testified that he was connected with the city government since 1903; that Mr. Burke was very active in trying to sell the Bienville Water Supply Company to the city. He stated he believed that it was very largely through Mr. Burke the property was purchased. He further stated that he did not mean to say it was through his magnetic influence, but from his untiring efforts from the beginning up to the time of the **purchase**. Wm. C. Carrell, a witness for the plaintiff, testified that he had been connected with the city administration from 1902; tnat Mr. Burke was very active in trying to sell the Bienville Water Supply Company works; that, in fact, it was due to his activity with the general council and mayor they were sold to the city. He testified that Burke was active all the time; that he would arrange committee meetings, at which Mr. Wood, the defendant, would sometimes attend; that Burke would arrange meetings and "handled it altogether"; that Mr. Burke was continually after the mayor and the council to purchase the waterworks, to get them to vote for it. Witness stated he thought Mr. Burke's influence exerted more power than the public opinion of the city of Mobile on the council. Pat J. Lyons, a witness for the defendant, testified that he was mayor of the city of Mobile and had been since 1904; that Mr. Burke was very active about the city buying the Bienville Water Supply Company works; that whenever a measure relating to that subject came up he would seek out the members of the council to get their influence to support any measure that was in favor of the purchase; that he would stop the members on the street and talk to them about it; that he took up the subject with him a good many times; that he was persistent in seeking out the members of the council personally, and talked with them about the matter. The defendant, Wood, testified, in his own behalf, that at the time Burke's services began he, Wood, was the treasurer and general manager as to the operation of the Bienville Water Supply Company's plant; that he had ceased to be connected with the company at the time the sale of the plant was consummated. He further testified that he made no contract with Burke for his services in the matter of the sale of said waterworks, but that Burke several times spoke to him regarding his desire to be of some use in selling the works to the city of Mobile; that he told Burke that, if the waterworks were sold to the city, the Bienville Water Supply Company would be glad to acknowledge his assistance if

he left the fixing of any compensation entirely with him, who was the treasurer of the company. He further testified that Burke was not employed in any way by him, but he was told by him, if he was of service in selling the plant by talking with citizens and creating a public sentiment in favor of the purchase by the city, the company would give him some money when the sale was completed. He stated that Burke of his own volition sought to bring the city and the company together in the matter, and was not employed to do so. Witness further stated that he paid Burke the money ($860) mentioned by him because he said he needed some money.

The defendant introduced in evidence a number of letters written by the plaintiff, Burke, to the defendant, Wood, and also several letters written by Burke to A. W. MacCallum, beginning with a letter dated June 20, 1902, and running down to September 12, 1905.

In the letter of June 20, 1902, to Wood, Burke says: "As inclosed you will find report of council, had they acted this report I send you as recommended by committee No. (6) would have been acted on favorably, but will be acted on at the next regular meeting which is July 15th, 1902, which favorable action is warranted. I could have had called a special meeting for the purpose of having the matter passed, but preferred to wait for the regular meeting."

June 21, 1902, in letter to Wood, he says: "Inclosed you will find official documents which will corroborate my previous communications mailed you. As I am moving slowly and surely, I now await the Genl. council meeting so that his Hon., the mayor, will communicate you direct. I want to say the time has come for you to make deal."

July 4, 1902, he writes to Walter Wood, president, as follows: "To confirm my previous communication, I have now and ready to report of Mr. Craft's arrival as chairman committee. Have also seen the committee as a whole, and they are now ready and have instructed me to notify you that they are ready and waiting on you, and to advise me what day during the coming week you will put in appearance. In this connection, permit me to suggest that I want you to come at once, as I want to be in readiness to have committee's action approved for meeting Genl. council 15th inst."

August 22, 1902, he writes Walter Wood, president, among other things, as follows: "I cannot write you as I wish, but I am satisfied a pointer to you would be greatly to your interest if I could see you. What I now write you will please retain it as confidential as the meetings were executive sessions."

November 9, 1902, he writes to Wood, president of Bienville Water Supply Company, among other things, as follows: "In this connection permit me to say that my funds is entirely exhausted, and, as I have use for same without mentioning what kind of use it is to be applied, a check from you would be very acceptable. In the meantime you will be advised of further progress as matter proceed."

November 20, 1902, he writes to Walter Wood, president, in referring to a remittance of $50, saying: "Now, Mr. Wood, I want to say that you well know that the amount is an unreasonable remittance, for which I am to apply the same, particularly at this time in finishing up and to get across the danger line."

Same letter: "Therefore I cannot use the small sum mailed, and will await your further advice in the matter. In the meantime whether you increase the amount or not, I will finish my work and use that energy I possess, and continue to have the influence as in the past to bring about the desired result. Had I the funds, I would not apply to you."

June 18, 1904, he writes in reference to making deal, and says, among other things: "I can personally advise as to matters and facts that I can't write about. * * * Important that you should be here at once."

September 12, 1905, Burke writes to A. W. MacCallum, saying, among other things, in reference to the sale sought to be made: "However, I reconciled my friends in the council, and after good work they became calm, and now I can inform you that I have the majority of the council, and will bring it up at the November meeting, and will show you that I alone, without the aid of any one, except the council, can sell, and accomplish the sale."

Same letter: "I am now better than ever, and you will see who has done

the work. The council stands to-day for me as follows: Mayor Lyons, Thos. E. Smith, A. S. Lyons, H. T. Inge, Max Michael, D. P. Brown, W. T. Holt, A. Oberhaus, W. C. Carroll, Joseph Norrille. Will have Craft and Tacon in line at November meeting."

Gregory L. & H. T. Smith, for plaintiff.
Bestor, Bestor & Young, for defendant.

TOULMIN, District Judge (after stating the facts as above). The counsel for the defendant in his argument on this motion limited his contention in support of the motion to two grounds, to wit: That the verdict was contrary to the evidence relating to the character of the work and labor done by the plaintiff, and to the charge of the court thereon; and that the court erred in refusing to give the general affirmative charge for the defendant. The contention on the part of the defendant is that the evidence clearly showed that the work and labor done by the plaintiff, compensation for which he claims in this suit, was work and labor done by him as a lobbyist, and that any services rendered by him in his efforts to sell the Bienville Water Supply Company's property were principally lobby services; and it is insisted on the part of the defendant that on the undisputed evidence in the case no other conclusion could have been justly or reasonably reached.

What is a "lobbyist"? A lobbyist is defined to be one who frequents the lobby or the precincts of a Legislature or other deliberative assembly with the view of influencing the views of its members. Sometimes defined as a person who hangs around legislators, and solicits them for the purpose of influencing legislation. "To lobby" is to solicit members of a legislative body, whether in the lobby or elsewhere, with the purpose to influence their votes. Webster's Dict.; Worcester's Dict.; Century Dict. tit. "Lobby-Lobbyist." "To lobby" is for a person not belonging to the Legislature to address or solicit members of the legislative body, in the lobby or elsewhere away from the house, with a view to influencing their votes. Chippewa Valley & S. R. Co. v. Chicago, St. P. M. & O. R. Co., 75 Wis. 224, 44 N. W. 17, 6 L. R. A. 601. "Lobbying services" are generally defined to mean the use of personal solicitations, the exercise of personal influence, and improper or corrupt methods, whereby legislative or official action is to be the product. A contract for such services is void, and cannot be enforced. Dunham v. Hastings Pavement Co., 56 App. Div. 244, 67 N. Y. Supp. 632, 634; Trist v. Child, 88 U. S. (21 Wall.) 441–448, 22 L. Ed. 623; Oscanyan v. Arms Co., 103 U. S. 261, 26 L. Ed. 539. According to the lexicographers and the decisions of the courts, we find that lobbying signifies to solicit members of a legislative body, in the lobby or elsewhere, with the purpose of influencing their votes; and the authorities hold that a contract for lobbying is void as against public policy. Authorities, supra. The Supreme Court of the United States, in Trist v. Child, supra, said:

"In our jurisprudence a contract may be illegal and void because inconsistent with sound policy and good morals. But Lord Mansfield has said: 'Many contracts which are not against morality are still void as being against the maxims of sound policy.'"

The court held that within the condemned category of contracts is one to pay for procuring a contract from the government. The court further held that, where legal and valid services are blended and confused with those which are forbidden, the whole is a unit and indivisible. That which is bad destroys the good, and they perish together. Trist v. Child, supra.

As I understood the contention on the part of the plaintiff in the argument on this motion, it was that the work and labor done by him was not as a lobbyist, in that the city council was not a legislative body, at least, so far as its action in connection with the purchase of the Bienville Water Supply Company's works was concerned; that the council acted in that matter as the agent or representative of the people of the city of Mobile to execute their wishes and authority in relation to said purchase thereto expressed and conferred by their votes, and hence the plaintiff's work with the council did not come within the purview of the policy forbidding lobbying. That the council of a city or corporate town is the local Legislature of that city or town I take it will not be questioned. A legislative body is any body of persons authorized to make laws or rules for the community represented by them. A legislative body is one capable of or pertaining to the enactment of laws. A legislator is one who makes laws for a state or community. It is a matter of judicial or common knowledge that the council enacts laws; establishes rules of action. They are called ordinances, but they are no less laws. There is no question that the council had legislative authority to purchase waterworks, and by one act of the Legislature of the state to purchase these particular works. It is, however, not contended by the learned counsel for the plaintiff that it did not have authority to purchase the waterworks, but it is suggested that the action of the council had to be approved or ratified. I do not so understand the law applicable to this case. Under the general powers conferred by the charter of the city of Mobile of 1901, considered in connection with the subsequent legislation of the state, I think the council had the right to purchase the waterworks without submitting the matter to the vote of the citizens of Mobile for approval. But, while the city had the right to purchase, through its council, the waterworks, it had no authority to issue bonds with which to pay for them, unless such issue of bonds be first authorized by a majority vote of the qualified voters of the city. The proposition required to be submitted to the voters of the city was the bond issue only. It may be true, doubtless was true, that it was necessary in this instance to issue bonds in order to make the purchase determined on by the council and mayor effective, but it is not apparent how that in any way affected the right of the council to make the purchase. Without the authority of the voters to issue bonds, the city may have lacked the ability to consummate the purchase, but it in no way, as it seems to me, affected its right or authority to purchase the waterworks. The legislative department of the city of Mobile is vested by its charter in a mayor and general council. That charter provides that it shall be the duty of the council to prevent crimes, and protect the rights of persons and property, to guard the public health, etc. How can this be done without the enactment of laws for the purpose? The council is authorized to

contract for, build, or purchase waterworks. How can it act in such case except in its legislative capacity, either by the adoption of an ordinance or resolution? Its legislative action is evidenced by its ordinances and resolutions, which are its laws.

Now, the question arises: Was the principal work and labor done by the plaintiff in his efforts to effect the sale of the Bienville Water Supply Company's works done by him as a "lobbyist"? Were his services in the matter principally "lobby services"? These questions must be answered by the evidence in the case. In my opinion they are affirmatively answered by the evidence of the plaintiff himself, and by his letters which were in evidence, corroborated and emphasized by the testimony of members of the council and the mayor of the city who were witnesses in the case. In referring to his efforts to effect the sale, the plaintiff testified that he discussed the matter with members of the council all the time, the mayor and others; worked whenever he had the opportunity, at night or in daytime, for several years; got up the meetings, and appeared before committee No. 6 (shown to be the water committee of the council); "arranged the bringing about the sale, and felt that he had accomplished it." He also did general work around, getting up public opinion to help him to carry out his efforts to effect a sale. He further testified that his "principal work was with the council of the city and to bring influence to bear on them"; that "he kept the work up with each succeeding mayor and each succeeding council down to the time the waterworks were sold," and "in that way was instrumental in bringing about the sale." In letter of June 20, 1902, to the defendant, the plaintiff says:

"This report I send you, as recommended by committee No. 6, will be acted on the next regular meeting. * * * I could have had called a special meeting for the purpose of having the matter passed, but preferred to wait for the regular meeting."

In letter of July 4, 1902, to the defendant he writes reporting the arrival of Mr. Craft as chairman of committee, and says:

"Have also seen the committee as a whole, and they are now ready and have instructed me to notify you. * * *"

In letter of November 20, 1902, to the defendant, referring to a remittance from defendant, plaintiff says:

"Whether you increase the amount or not, I will finish my work and use that energy I possess, and continue to have the influence as in the past to bring about the desired result. Had I the funds, I would not apply to you."

In letter September 12, 1905, to A. W. MacCallum, the plaintiff says:

"I reconciled my friends in the council, and after good work they became calm, and now I can inform you that I have the majority of the council, and will bring it up at the November meeting, and will show you that I alone, without the aid of anyone, except the council, can sell, and accomplish the sale. * * * I am now better than ever, and you will see who has done the work. The council stands to-day for me as follows: [naming 10 persons; and adds] Will have Craft and Tacon in line at November meeting."

Witness A. S. Lyons testified:

"Mr. Burke rendered services in negotiating the sale of the Bienville Waterworks. He was very active, and I am frank to say I don't think the pur-

chase would have been made if it was not for Mr. Burke.  I think, if Mr. Burke had not interested the city council in the proposition to take it up, the people would never have voted on it.  His work was to a great degree with the council."

Witness Craft said:

"Mr. Burke did work looking to the sale of the Bienville Water Supply Company.  He wanted me to consent as a member of the city council to buy it.  I was chairman of the water committee known as No. 6.  I finally brought the committee together, and Mr. Burke came before it."

Witness stated that "Burke was very active and was after him all the time."

Witness Norville testified that:

"Mr. Burke was very active in trying to sell the Bienville Water Supply Company to the city.  It was very largely through Mr. Burke the property was purchased from his untiring efforts from the beginning to the time of purchase."

Witness Carrell testified that:

"Mr. Burke was very active in trying to sell the Bienville Water Supply Company's works; in fact, it was due to his activity with the general council and mayor they were sold to the city.  Mr. Burke was active all the time. Mr. Burke would arrange committee meetings and was continually after the mayor and the council to purchase the waterworks; to get them to vote for it.  I think Mr. Burke's influence exerted more power than the public opinion of the city of Mobile on the council."

Witness Pat J. Lyons testified that:

"Mr. Burke was very active about the city buying the Bienville Water Supply Company works.  Whenever a measure relating to that subject came up, he would seek out the members of the council to get their influence to support any measure that was in favor of the purchase.  He would stop the members on the street, and talk to them about it.  He took the matter up with me a good many times, and was persistent in seeking out the members of the council personally and talking with them about the matter."

This was substantially all the evidence relative to the work and labor done or services rendered by the plaintiff.

The court, among other things, charged the jury:

"If you believe from the evidence that there was a contract made by the plaintiff with the defendant under which the plaintiff was to procure by lobbying services, if possible, the making of a contract of purchase by the city of Mobile, through its mayor and council, of the Bienville Water Supply Company's waterworks, and for which services the plaintiff was to be paid, then the court charges you that such contract would be void as against public policy, and the plaintiff cannot recover on said contract; or, if you believe from the evidence that there was no such express contract, but that the plaintiff did, at the request of the defendant, perform work and labor, and render services for him, in the effort to effect a sale of the Bienville Water Supply Company's waterworks, and you further believe from the evidence that the work and labor so done by the plaintiff was done as a 'lobbyist' and the services rendered were 'lobby' services, then the court charges you that the plaintiff cannot recover for the work and labor so done; and the court further charges you that if this suit is brought to recover compensation for work and labor done as a 'lobbyist,' and for services other than 'lobby services,' rendered by him, and these services were blended with the services as 'lobbyist,' the plaintiff cannot recover in this case.  Pay for 'lobby services,' or for work and labor done as 'lobbyist,' irrespective of an express contract therefor, is not recoverable in a court of justice."

The court further charged the jury in substance as follows:

"A 'lobbyist' is one who frequents the lobby or the precincts of a Legislature or other deliberative assembly with the view of influencing its members, by personal solicitation, the exercise of personal influence, or by improper methods, whereby legislative or official action is to be procured. To 'lobby' is to try to influence such members, and to solicit their votes, whether in the lobby or elsewhere. 'Lobby services' are defined to be solicitations by persons supposed to have personal influence with the members of a legislative body to procure certain legislative action."

The jury returned a verdict for the plaintiff for $4,000.

We have seen that a "lobbyist" is a person who solicits members of a legislative body, in the lobby or elsewhere, with the purpose of influencing their votes, one who hangs around legislators for the purpose of influencing such legislators whereby legislative action is to be procured; and that "lobby services" are personal solicitations with members of a legislative body to procure certain legislative action; to solicit votes from such members, whether in the lobby or elsewhere, for said purpose. I think the evidence abundantly shows that the plaintiff solicited members of the council in the lobby or precincts of their place of assembly, and elsewhere, with the purpose of influencing their votes in support of a measure to purchase the Bienville Water Supply Company's works; that he personally solicited their votes in that behalf, and exerted an influence over them in their legislative action in the premises. And my opinion is that the evidence establishes, beyond controversy, that the principal work and labor done by the plaintiff in his efforts to sell said waterworks was done by him as a "lobbyist"; and that his services rendered in connection therewith were principally "lobby services." There is a prohibition to the courts of the United States to re-examine any facts tried by a jury in any other manner than according to the rules of the common law. Const. U. S. Amend. 7. The only mode known to the common law to re-examine such facts are the granting of a new trial by the court where the issue was tried. Lincoln v. Power, 151 U. S. 438, 14 Sup. Ct. 387, 38 L. Ed. 224. Where the evidence offered for the party for whom a verdict is rendered, conceding to it the greatest probative force to which, according to the laws of evidence, it is fairly entitled, is insufficient to support or to justify the verdict, it is the duty of the court to set it aside and grant a new trial. Southern Pac. Co. v. Hamilton, 54 Fed. 468, 4 C. C. A. 441; Pleasants v. Fant, 22 Wall. (U. S.) 120, 22 L. Ed. 780.

In my judgment the verdict in this case is manifestly against the evidence and the charge of the court; and a more thorough examination and consideration of the evidence, tested by the law of the issue, than was afforded me during the progress of the trial, has satisfied me that the court erred in refusing to give the general affirmative charge requested by the defendant. Justice, therefore, requires that the verdict be set aside and a new trial granted. And it is so ordered.