THE HONORABLE, THE ASSEMBLY, Legislature
You have, by resolution, requested my opinion with respect to the constitutionality of Assembly Substitute Amendment 3 to 1977 Assembly Bill 93, especially as it affects the rights of citizens to petition the government and to be secure against unreasonable searches and seizures. I have concluded that, with certain exceptions, the legislation under consideration is compatible with those constitutional rights.
Substitute Amendment 3 is a comprehensive plan to intensify the regulation of lobbying in state government. It is comprised of various provisions requiring licensing and disclosure of defined lobbying activities as well as a list of prohibited practices. The substitute amendment also establishes powers and procedures for enforcement of the several substantive provisions and sanctions for their violation. *Page 86 
Lobbying, as much as mass demonstration at the other extreme of subtlety, is a means of petitioning the government, and is therefore protected by the first amendment to the United States Constitution.[1] Fritz v. Gorton, 83 Wash.2d 275, 517 P.2d 911,929, app. dismissed, 417 U.S. 902 (1974); United States v.Finance Committee to Reelect the President, 507 F.2d 1194, 1201
(D.C. Cir. 1974). See United States v. Harriss, 347 U.S. 612,625, 627 (1954). The degree of protection is not diminished either because lobbying involves vigorous advocacy rather than abstract discussion, see Buckley v. Valeo, 424 U.S. 1, 48, 75
(1976); NAACP v. Button, 371 U.S. 415, 429, 437 (1963), or because in some cases the petitioner pays another to advocate his cause. Moffett v. Killian, 360 F. Supp. 228, 231 (D. Conn. 1973), and cases cited. See Buckley v. Valeo, supra, 16, 75. Like other expressive activities protected by the first amendment, lobbying is a fundamental right, regulation of which can be justified only by a compelling state interest. Advisory Opinionon the Constitutionality of 1975 PA 227, 396 Mich. 465,242 N.W.2d 3, 23 (1976). See Buckley v. Valeo, supra, 25; NAACP v.Button, supra, 438. Cf. In re Kading, 70 Wis.2d 508, 527,235 N.W.2d 409, 238 N.W.2d 63, 239 N.W.2d 297 (1975). Any justifiable regulation must be accomplished, moreover, by precisely drawn means which narrowly achieve the legitimate end without unnecessarily abridging broader exercise of the regulated right.Buckley v. Valeo, supra, 25; NAACP v. Alabama, 377 U.S. 288, 307,308 (1964), and cases cited; In re Kading, supra, 527. Neither may these means unnecessarily abridge protected exercise of other constitutional rights. See State v. Mahaney, 55 Wis.2d 443, 448,198 N.W.2d 373 (1972); State v. Zwicker, 41 Wis.2d 497, 507,164 N.W.2d 512 (1969). Substitute Amendment 3 is detailed and lengthy legislation. Because it directly affects protected rights, the constitutionality of a number of its provisions are subject to question. Discussion of all the provisions of the bill would not be particularly productive, however, since there is no serious doubt about the constitutionality of many of them. Statutes, of course, are presumed to be constitutional, and will be declared constitutionally defective only if such deficiency is demonstrable beyond a reasonable doubt. E.g. State ex rel. *Page 87 Hammermill Paper Co. v. La Plante, 58 Wis.2d 32, 47,205 N.W.2d 784 (1973), and cases cited. Consequently, although I have considered all the provisions of the substitute amendment which are relevant to the opinion request, I will comment specifically only on those which present substantial questions concerning their possible infringement on the first and fourth amendment rights of Wisconsin citizens. The right of lobbyists to engage in that occupation will be considered only to the extent necessary to examine the effect of the substitute amendment on the rights of citizens to petition the government and to privacy.
 I. Sec. 1 Corrupt Means To Influence Legislation; Disclosure of Interest.
The first section of Substitute Amendment 3 provides:
 "Any person who gives or agrees or offers to give any thing of value to any person, for the service of such person or of any other person in procuring the passage or defeat of any measure before the legislature or before either house or any committee thereof, upon the contingency or condition of the passage or defeat of the measure, or who receives, or agrees to receive anything of value for such service, upon any such contingency or condition, or who, having a pecuniary or other interest, or acting as the agent or attorney of any person in procuring or attempting to procure the passage or defeat of any measure before the legislature or before either house or any committee thereof, attempts in any manner to influence any member of the legislature for or against the measure, without first making known to the member the real and true interest he or she has in the measure, either personally or as such agent or attorney, may be fined not more than $5,000 or imprisoned in the county jail not more than one year or both." (Emphasis added.)
The emphasized phrase raises related constitutional questions with respect to its construction.
Provisions of a penal statute are unconstitutionally vague if they fail to give reasonable notice of the prohibited conduct to persons trying to avoid their penalties. State v. Mahaney, supra, 448, and cases cited. This occurs when the wording of a statute is so obscure that persons of ordinary intelligence necessarily must guess at its meaning and differ about its applicability.Ibid. Standards of *Page 88 
definitive sufficiency are particularly strict when, as here, the statute affects fundamental first amendment freedoms. Buckley v.Valeo, supra, 77; NAACP v. Button, supra, 432.
It is not clear from reading the section in question whether it requires disclosure of interest by all persons having any pecuniary or other interest in any aspect of a legislative measure, or whether, in addition to agents and attorneys, only those with a pecuniary or other interest in passage or defeat of the measure per se must make known their interest prior to attempting to influence a legislator.
In spite of the fact that the first section of the substitute amendment simply recreates, with slight stylistic alterations and a higher fine, the corrupt influence law which has been in effect in Wisconsin for a century, no authoritative judicial construction has resolved the problem. The statute, in fact, has been considered in only one reported case, and then only cursorily in a note appended to the opinion after it had been filed. Chippewa Valley and S. Ry. Co. v. Chicago, St. P., M. andO. Ry. Co., 75 Wis. 224, 253, 44 N.W. 17 (1889). There it was declared without discussion that the word "person" includes both natural and artificial entities, i.e., corporations. Ibid.
Nevertheless, a reasonable construction may be given the section which will avoid any ambiguity. See generallyUnited States v. Harriss, supra, 618; State ex rel. Hammermill Paper Co.v. La Plante, supra, 47.
That ambiguity is caused by the absence of any specific object of the word "interest" in the phrase under consideration, and its consequent failure to inform what the disclosable pecuniary or other interest is to be. Either of the two objects mentioned above may be supplied, depending on whether the phrase is interpreted in isolation or in the complete context of the corrupt influence statute. If the phrase is seen as an integral unit inherently defining one of two classes of required reporters, since it is internally unlimited except by the rule ofejusdem generis[2] its otherwise unrestricted words would *Page 89 
apply universally to include any pecuniary or similar interest in a legislative measure. If, however, the phrase is observed to be but part of a statute which otherwise clearly is concerned with interests in passage or defeat of legislation, it is not unreasonable to believe that the concern of this portion is completely consistent with the overall concern of the whole statute instead of the sole exception. See 2A Sands, SutherlandStatutory Construction, sec. 46.05, pp. 56, 57 (4th ed. 1973).
Although there is equivocal authority to the contrary, seeSutherland, supra, vol. 2A, sec. 47.02, p. 71, the rule in this state is that, in construing legislation, the meaning of a section of a statute must be derived from the act as a whole.State ex rel. B'Nai B'Rith Foundation of U.S. v. Walworth CountyBd. of Adjustment, 59 Wis.2d 296, 308, 208 N.W.2d 113,64 A.L.R. 3d 1075 (1973), and cases cited. The propriety of contextual interpretation in this particular situation also is suggested by the punctuation of the section, which can be considered as an aid to interpretation if the intent of the Legislature is unclear.See generally Sutherland, supra, vol. 2A, sec. 47.15, p. 98. The entire statute is but a single sentence.
Perceiving the phrase, "pecuniary or other interest," in the context of other rules regulating lobbying reinforces the restrictive interpretation resulting from construction of the corrupt influence statute as a complete entity. All other sections of Substitute Amendment 3, with their civil penalties, apply only to persons with pecuniary interests in passage or defeat of legislation, either as lobbyists who are paid to influence or attempt to influence lawmakers, or as principals who pay lobbyists to do so. Surely it was not intended that a section with more severe criminal penalties be applicable more broadly to citizens with personal pecuniary interests in the substance of legislation. Lobbying laws, no less than any others, must be given a logical, sensible and reasonable construction. State v.Hoebel, 256 Wis. 549, 552, 41 N.W.2d 865 (1950). *Page 90 
Although additional arguments may be made in favor of a construction limiting pecuniary and other interests to those in passage or defeat of legislation per se, and reasonable arguments can be advanced in opposition, no purpose would be served by further discussion since, if the section is to be construed in a way which will preserve its constitutionality, it must be construed in the more narrow manner in any event.
A statute which regulates fundamental constitutional rights is impermissibly broad if it restricts exercise of those rights any more than is minimally necessary to achieve the compelling purpose which justifies regulation at all. NAACP v. Alabama,supra, 307, 308, and cases cited; In re Kading, supra, 527. SeeBuckley v. Valeo, supra, 25.
The purpose of the corrupt influence law is not the same as that of the remainder of Substitute Amendment 3, as stated in the second section of the amendment. Its similar but more limited purpose, rather, as indicated in the introduction to the ancestral enactment, is "to protect the people against corrupt and secret influences in matters of legislation." Ch. 145, Laws of 1858, p. 200. There is reason to suppose that this is a sufficiently compelling purpose to justify some requirement of disclosure of those interests prior to lobbying so that legislators more readily may resist, discount, or otherwise properly assess them. See United States v. Harriss, supra, 625;Advisory Opinion on the Constitutionality of 1975 PA 227, supra, 23. Cf. Buckley v. Valeo, supra, 25-27.
In order to accomplish this purpose, however, not every interest in a legislative proposal need be disclosed. It is sufficient if only "corrupt and secret influences," those beyond the legitimate interests of ordinary concerned citizens, are revealed. These reasonably include pecuniary and similar interests in procuring or attempting to procure passage or defeat of a legislative measure per se, which provide incentive to employ bribery and other corrupt methods of persuasion, see 51 Am. Jur. 2d, Lobbying, sec. 4, p. 995, and the related per se
interests of agents and attorneys, which might be masked by an affected concern for the common good. See United States v.Harriss, supra, 625; Fritz v. Gorton, supra, 931.
There is no need to compel, under the possible penalty of imprisonment, all citizens who are pecuniarily interested in the *Page 91 
substance of legislation as businesspersons or even taxpayers to disclose this personal interest prior to petitioning their elected representatives on their own behalf. Cf. Annot.,Lobbying-Regulations, 42 A.L.R. 3d 1046, sec. 3, p. 1051 (1972). Such interests are neither unexpected nor improper. Eastern RailroadPresidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127,139 (1961). The right of the people to inform their representatives in government of their desires cannot be made to depend on whether or not its exercise is motivated by financial interest. Ibid.
It is my opinion, therefore, that the corrupt influence statute should be construed to require prelobbying disclosure of interest only by agents and attorneys of others, and by persons having a pecuniary or similar interest in passage or defeat of a legislative measure per se. Construed in this limited manner the statute is, with the exception of the definitional problem noted, neither unconstitutionally vague nor overly broad, as far as the ordinary citizens of this state are concerned.
Additional first and fifth amendment questions raised by the statute as applied to agents and attorneys, and those with per se
pecuniary interests, are beyond the scope of this opinion.
II. Sec. 3 Definition of Lobbying.
On several occasions the United States Supreme Court has expressed serious doubt about the constitutionality of laws which affect the efforts of private individuals to influence public opinion, however remote the influence of those efforts on the ultimate legislative process.
Such laws have never been expressly declared unconstitutional by the Court. But in United States v. Rumely, 345 U.S. 41, 45-47
(1953), a congressional investigative resolution was upheld by limiting the scope of the "lobbying activities," into which a subcommittee was authorized to inquire, to representations made directly to members of Congress. And in United States v. Harriss,supra, 620, 621, the Court, in order to avoid the first amendment issue which would be raised by "broader application to organizations seeking to propagandize the general public," read out of the federal lobbying law the word "indirectly." The court restricted the reach of the statute to persons and contributions, one of whose main purposes was to influence passage or defeat of legislation, when the intended *Page 92 
method of accomplishing this purpose was through direct communication with federal legislators.
An analogous state statute, requiring registration by anyone engaged in promoting or opposing in any manner the passage of legislation on behalf of any race or color, was struck down by a three-judge federal court in NAACP v. Patty, 159 F. Supp. 503
(E.D. Va. 1958). The fault found with this provision was that it imposed a duty to register "upon anyone who in concert with others merely speaks or writes on the subject, even if he has no contact of any kind with the legislative body and has neither received nor spent any money to further his purpose." Id., 525. This case was vacated by the Supreme Court in Harrison v. NAACP,360 U.S. 167 (1959), because the registration statute, and others also declared unconstitutional below, were susceptible to state court constructions which would avoid the necessity for federal adjudication. The Supreme Court heavily hinted that the limitations imposed in Rumely and Harriss would require a different result on the constitutional question. Id., 177, 178.
Although the Supreme Court's studied avoidance of this question has left the applicable constitutional principles less than clear, the import of its opinions seems to be that the government may not regulate, as "lobbying," persuasive activities relating to legislation which involve no direct communication with lawmakers. Conversely, efforts to influence passage or defeat of legislation by means of direct communication with lawmakers, whether oral or written or a solicitation of others directly to communicate, are subject to some degree of regulation when the collection or expenditure of funds for that purpose is involved.See United States v. Harriss, supra, 629 (Douglas, J., dissenting). See also Advisory Opinion on the Constitutionalityof 1975 PA 227, supra, 22 n. 44.
The applicability of Substitute Amendment 3 is established by the definition of lobbying in sec. 3. Lobbying is defined as "the practice of attempting to influence legislative or administrative action by direct oral or written communication to any elective state official, agency official or legislative official or by paid advertising through communications media."
The first class of defined lobbying activities obviously presents no federal constitutional problem. The second class of activities, however, which makes no distinction between media advertising *Page 93 
aimed at simply influencing public opinion on a legislative measure, and perhaps lawmakers indirectly as a result, and advertising which seeks to solicit others to communicate directly with lawmakers, is applicable on its face to apparently impermissibly indirect, as well as permissibly direct, communication with policymaking state-officials.
Section 32 of the substitute amendment exempts from the subchapter's application lobbyists, officers or employes of government agencies, and working members of the press whose lobbying activities are limited, inter alia, solely to public persuasion through communications media. This section reduces, but does not remove, the constitutional objections to the proposed law. Its provisions still are applicable to indirect communicative activities if a lobbyist, government officer or employe, or reporter engages in both direct and indirect communicative activities.
It is my opinion, therefore, that the definition of lobbying, insofar as it includes indirectly communicative paid advertising through communications media, is probably unconstitutionally broad.
An additional difficulty could be presented by the extension of the definition of lobbying, and therefore lobbying regulations, to "administrative action," defined in sec. 4 of the substitute amendment as "the proposal, drafting, development, consideration, promulgation, amendment, repeal or rejection by any agency of any rule promulgated under ch. 227."
Administrative agencies are public tribunals which possess, not only this limited power to legislate, but also the quasi-judicial power and authority to determine the rights of particular persons according to law. See State ex rel. Thompson v. Nash, 27 Wis.2d 183,195, 133 N.W.2d 769 (1965); secs. 227.01 (2) and (9), 227.014 and 227.07, Stats. In some cases the power to make rules and the power to determine individual rights may be involved in the same administrative proceeding. See Ashwaubenon v. StateHighway Comm., 17 Wis.2d 120, 127, 115 N.W.2d 498 (1962). Representation of an affected person in such a proceeding may require inextricably intertwined efforts to influence the broad rule under consideration, as well as assertive advocacy of the client's legal rights in order to assist in the proper interpretation and enforcement of the law. These activities conceivably could simultaneously constitute both lobbying, under the proposed definition, and the *Page 94 
practice of law, as defined by the Wisconsin Supreme Court inState ex rel. State Bar v. Keller, 16 Wis.2d 377, 388,114 N.W.2d 796, 116 N.W.2d 141 (1962), vacated on other grounds 374 U.S. 102
(1963), on remand 21 Wis.2d 100, 123 N.W.2d 905 (1963), cert.denied 377 U.S. 964 (1964).
It is beyond the scope of this opinion to analyze the range of activities that would constitute both the practice of law and lobbying before administrative agencies under the proposed definition. Some of these questions are presently under consideration by the Unauthorized Practice of Law Committee of the Wisconsin State Bar Association.
The Legislature, as indicated previously, has authority properly to regulate lobbying. The practice of law, however, may be regulated in this state only by the judiciary, ultimately the State Supreme Court. State ex rel. State Bar v. Keller, supra, 386; State ex rel. Reynolds v. Dinger, 14 Wis.2d 193, 202, 203,109 N.W.2d 685 (1961). The Legislature may aid but not thwart the courts in the exercise of this state constitutional power. Stateex rel. Reynolds v. Dinger, supra, 203. The Legislature may not forbid a practice of law not forbidden by the courts. Ibid.
The regulation of lobbying in administrative proceedings pursuant to Substitute Amendment 3 ultimately includes prohibition of its practice if the conditions imposed are not complied with. Substitute Amendment 3, sec. 19, amending sec. 13.63 (3), Stats. In those cases in which conduct might constitute both lobbying and the practice of law, the amendment could be intruding into an area constitutionally reserved exclusively to another branch of government. Cf. In re.Cannon, 206 Wis. 374, 240 N.W. 441 (1932).
III. Sec. 5 Definition of Lobbyist.
Section 5 of the substitute amendment defines a lobbyist as "any person who is paid a salary, fee or retainer by a principal and whose regular duties include lobbying." There is some question about the meaning of the phrase "regular duties."
Generally, words and phrases in Wisconsin laws are to be construed according to common and approved usage. Sec. 990.01
(1), Stats. Such usage may be established by the definition given in a recognized dictionary. Estate of Nottingham, 46 Wis.2d 580, *Page 95 
588, 175 N.W.2d 640 (1970). Webster's Third NewInternational Dictionary, p. 1913, offers a number of definitions of the word "regular."
The largest group of meanings has a chronological connotation, involving, essentially, repetition of events at certain temporal intervals. It was with this meaning that the word "regular" was used in Senate Substitute Amendment 1 to 1977 Senate Bill 286. I pointed out in my opinion on the Senate bill that the slightly, but critically, different definition of lobbyist was unconstitutionally vague because the precise point in time when lobbying activities become regular rather than occasional is a matter of opinion about which there may be considerable difference among reasonable persons.
"Regular," however, also may mean conducted or done in conformity with established or prescribed usages or rules.Webster's Dictionary, supra. In this sense the word is somewhat synonymous with normal or ordinary. It seems to be in this second sense that "regular" is used in the Assembly's definition of lobbyist. "Regular duties" reasonably appear to be those which are agreed, expected or anticipated to be performed, in execution of an employment contract. They are those duties which would be found in a job description.
Although there still may be individual instances in which it is questionable whether lobbying is a regular duty of a particular employe or agent, the existence of borderline cases does not make a regulatory statute unconstitutionally vague. Roth v.United States, 354 U.S. 490, 491, 492 (1957). In my opinion, the definition of lobbyist in Substitute Amendment 3, if construed as I believe it should be, is sufficiently definite to give reasonable persons adequate notice of the conduct regulated. Cf.United States v. Harriss, supra, 622, 623. See generally State v.Mahaney, supra, 448 and cases cited. I would, nevertheless, suggest some clarification of meaning in the manner I have outlined so that questions of definition can be avoided in actual application of the law.
IV. Sec. 16 Prohibited Practices.
Section 16 of the substitute amendment prohibits professional lobbyists from engaging in certain specified practices. The constitutionality of this list, as it pertains to such lobbyists, is beyond the scope of the present opinion. The section, however, next prohibits *Page 96 
principals, earlier defined as any person who engages a lobbyist, from engaging in two of the listed practices.
First, principals may not furnish lodging, transportation, food, meals, beverages, money, or any other thing of pecuniary value to any officer or employe of the state, or to any elective state official or candidate for elective state office, except the Governor when acting in an official capacity. Conversely, no candidate for an elective state office, elective state official, or other officer or employe of the state may solicit or accept anything of pecuniary value from a principal, except campaign contributions at specified times and, in the case of legislators, reimbursed expenses, speaking fees and compensation for published works.[3]
Generally, there does not appear to be any recognized constitutional right to furnish things of pecuniary value to state government personnel, nor any reciprocal right of state government personnel to solicit or accept such things. However, a problem exists when one spouse is a state elective official or other officer or employe and the other spouse is a principal. Thefirst amendment right to associate includes the right to associate with a spouse in marriage. Griswold v. Connecticut,381 U.S. 479, 486 (1965). This reasonably includes the right to share lodging, food, and myriad other things of pecuniary value ordinarily given and received in the marital relationship. Cf.,Ibid. See also Meyer v. Nebraska, 262 U.S. 390, 399 (1923).
The prohibited practices section does not discriminate in its application between persons who are married and those who are not. It prohibits the furnishing of food, clothing and shelter to a spouse, who also happens to be associated with state government, as well as to unrelated state government personnel. The section thereby regulates a fundamental right.
The patent purpose of prohibiting the exchange of pecuniarily valuable things between those involved in lobbying and those involved in government is to prevent the purchase of official favors, and the appearance of such purchases as well. Both are compelling state *Page 97 
interests justifying some regulation of fundamental rights.Buckley v. Valeo, supra, 26, 27.
The initial problem is that the restrictions imposed on the marital relationship do not really accomplish this purpose. Any appearance of impropriety is given simply by the intimacy of the marital relationship itself, which implies the sharing of both affections and possessions. More important, since an officer, employe, shareholder or partner of an association, corporation or partnership is not personally a principal, Substitute Amendment 3, sec. 8, p. 4, almost anyone bent on evading the restrictions can do so, by forming an organization to engage a lobbyist. No substantial societal interest is served by restrictions designed to prevent corruption which still permit unscrupulous persons to spend unlimited sums of money to obtain improper influence over government personnel. Buckley v. Valeo, supra, 45.
These restrictions excessively burden the protected marital relationship. It hardly can be suggested seriously that a spouse is likely to misuse a public position for those simple niceties and necessities which are expected to be exchanged in any marriage. Nor is there any appearance of misuse, in excess of whatever appearance inherently is created by the marital relationship itself, given by such simple exchanges.
Equally troublesome is the overreach of the restrictions to any state employed spouse, even those laboring at the most menial civil service tasks, who are without any ability whatever to influence legislative or administrative decision making in their own bureaus, much less in the upper levels of other departments of state government. These persons present no greater danger of corruption, in reality, than those outside the governmental structure, and there is no reason to impose any restrictions on their marriages. Cf., Advisory Opinion on the Constitutionalityof 1975 PA 227, supra, 20, 21.
It is no answer to these excesses that they may be evaded. If protected expression is made impossible by the threat to the marital relationship the law exacts too heavy a price.
The prohibition of the practice of furnishing things of pecuniary value to state personnel is unconstitutionally overbroad, as applied to principals, because its unrestrained sweep unnecessarily burdens *Page 98 first amendment marital rights without accordingly serving any substantial state interest.[4] See generally Buckley v. Valeo,supra, 25, 47, 48; NAACP v. Alabama, supra, 307, 308; In reKading, supra, 527.
The second practice prohibited to principals is that of making campaign contributions to candidates for state offices to be filled at the general election, except between June 1st and the day of the election. Contributions may not be made to legislative candidates even during this five-month time unless the Legislature is not in session or has recessed.
This prohibition restricts an aspect of the contributor's right of political association, again a fundamental right protected by the first amendment. Buckley v. Valeo, supra, 24, 25. Some restriction is justified by the danger of contributions being made to secure political favors from current and potential office holders, and by the appearance of corruption coming from public awareness of the opportunity for abuse when an official's campaign has been financed by a few large contributions. Id., 25. But the restrictions on contributions in sec. 16, like the restrictions on supporting spouses, go beyond those necessary to protect the integrity of our system of representative democracy.
The restrictions, as a practical matter, do not prevent principals from influencing, or attempting to influence, candidates with contributions to their campaigns. A principal, again, need only form an organization for the retention of a lobbyist to remain free to lavish contributions when, and on whom, he chooses. And if the principal should find this evasion too troublesome, he still is free to promise when, and to whom, he wishes to make a contribution during the next permitted period. A candidate, if he is susceptible to financial influence, will be as easily influenced by contributions made within the permitted period as without.
The restrictions on timing, but not size, of contributions do not dispel any appearance of impropriety either. That appearance is created merely by the making of a large contribution at a time proximate to that at which legislative or administrative action of *Page 99 
concern to the contributor occurs, especially if the elected official's position is favorable to the contributor. Seldom are governmental decisions made instanter; more likely they are finally reached only after discussion for months or years during which many pressures are applied to the deciders.
Finally, the contribution restrictions are unconstitutionally excessive. They not only limit, but totally prohibit, one aspect of political association with any candidate in the primary campaign, which in many cases may be the election, Cf.United States v. Classic, 313 U.S. 299 (1941), and may prohibit such association with legislative candidates in the general election if the Legislature remains in session all through the permitted contribution period. The same state purposes which prompt such drastic abridgement of first amendment freedoms can be achieved, however, perhaps more effectively, by the less restrictive and constitutionally permissible means of ceilings on the amount of contributions which may be made to a candidate in a political campaign. See Buckley v. Valeo, supra, 26-29. This unnecessary excess constitutes an impermissible burden, for reasons discussed previously, even though the restrictions may be evaded.
The restrictions on campaign contributions are overly broad as applied to principals because they, too, unnecessarily burdenfirst amendment rights without thereby serving any substantial state interest. See generally Buckley v. Valeo, supra, 25, 47, 48; NAACP v. Alabama, supra, 307, 308; In re Kading, supra, 527.
V. Sees. 17 And 22 Licensing of Lobbyists.
Section 22 of Substitute Amendment 3 prohibits principals from permitting lobbyists to act on their behalf until the lobbyists are duly licensed. Section 17 establishes the procedure for license application. It provides further that no application may be disapproved by the board on elections and lobbying without affording the applicant a hearing. Denial of a license may be reviewed pursuant to the procedures provided in ch. 227, Stats.
Inherent in the latter provisions of sec. 17 is the assumption that the board may deny a lobbying license, thereby stifling, for a time at least, the ability of a principal to petition the government in a constitutionally protected manner. No criteria are set forth, though, to guide the board in deciding when to deny a license. *Page 100 
 "[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-151 (1969), and many cases cited. See also Mutual Fed. Savings and Loan Assn. v. Savings and Loan Adv. Comm., 38 Wis.2d 381, 389, 157 N.W.2d 609 (1968).
Both secs. 17 and 22, since they totally lack standards for denial of a license to engage in lobbying, are unconstitutional.
 VI. Sec. 18 Suspension of License For Failure Timely To File A Complete Expense Statement.
Section 18 authorizes the board on elections and lobbying to suspend the privilege of any lobbyist to lobby on behalf of a principal if the principal fails to file a complete expense statement on time. Provision is made for mailing notice of the alleged delinquency and anticipated termination of privileges to the delinquent principal and any lobbyist registered to act on his behalf. The principal is given a 10 day period of grace, after which, if he still has not filed a complete expense statement, no lobbyist is permitted to act on his behalf. Lobbying privileges are restored immediately on filing the delinquent statement. This section, unlike analogous sections of the substitute amendment authorizing denial and revocation of lobbying licenses, does not provide for a hearing prior to suspension of lobbying privileges.
The lack of opportunity for a hearing is a serious defect in the law and raises constitutional problems. A right, privilege or license, once granted by the government, cannot be suspended for failure to comply with continuing licensing requirements without affording the licensee a hearing. Bell v. Burson, 402 U.S. 535,539 (1971), and cases cited; Chicago and NorthwesternTransportation Co. v. Pedersen, 80 Wis.2d 566, 571,259 N.W.2d 316 (1978). In some cases, when immediate harm to the public is threatened and the private interest infringed is reasonably deemed to be of less importance, a post suspension hearing is sufficient. Goldberg v. Kelly, 397 U.S. 259, 263 n. 10 (1970). When first amendment rights are infringed, however, an adversary hearing must be held prior to suppression of the right to engage in speech related activities *Page 101 
ordinarily protected by that provision of the constitution.Compare Ibid. with State v. I, A Woman — Part II, 53 Wis.2d 102,112, 113, 191 N.W.2d 897 (1971), and cases cited. In my opinion, failure to provide for a presuspension hearing would violate the first and fourteenth amendment rights of both principals and lobbyists.
At a presuspension hearing the licensee is entitled to at least the minimum procedures mandated by notions of due process, including notice of the nature of the complaint against him and an opportunity to contest the assertion that he has failed to comply with the pertinent regulations. Bell v. Burson, supra, 540-542; Chicago and Northwestern Transportation C.o. v.Pedersen, supra, 571, 572.
Other provisions of Substitute Amendment 3 make the failure to provide for a presuspension hearing particularly puzzling.
If a lobbyist or principal actually makes prohibited expenditures he is subject to revocation of lobbying privileges for a maximum of three years. Substitute Amendment 3, sec. 30, creating sec. 13.69 (7), Stats. Such person is entitled to a judicial hearing on the issue of his liability. Substitute Amendment 3, sec. 28, creating sec. 13.685 (5), Stats. And the board is authorized to compromise and settle such a case if, in the board's opinion, it constitutes a minor violation caused by excusable neglect or should not be prosecuted in the public interest for other good cause shown. Ibid.
If a lobbyist or principal merely fails to report expenditures, which may or may not have been prohibited, he is subject to an indefinite suspension of lobbying privileges. No hearing of any kind is provided for. The gravity and causes of the violation appear to be irrelevant where the question is or may be permanent deprivation of the right to petition the government by lobbying. One can think of numerous examples of excusable neglect, such as failure of the mails, illness, vacations, etc. which might be the reason for a principal's failure to file. No opportunity is provided, as in the instance of other violations, for the Board to consider these matters.
Although I have been asked to give my opinion only on first andfourth amendment problems possibly created by this pending legislation, I feel obliged to point out that an unexplained distinction may violate the equal protection provision of thefourteenth amendment unless there is an explanation of which I am not now aware. Cf. State v. Asfoor, 75 Wis.2d 411. 440, 441,249 N.W.2d 529 *Page 102 
(1976); State ex rel. Kovach v. Schubert, 64 Wis.2d 612, 616-622,219 N.W.2d 341 (1974); State v. Johnson, 74 Wis.2d 169, 173, 174,246 N.W.2d 503 (1976).
VII. Secs. 18, 20, 21, 27 And 32 Disclosure Requirements.
Several sections of Substitute Amendment 3 require principals who spend more than $250 per year for lobbying activities not limited to public presentations to file reports with the board on elections and lobbying. The reports are required to contain detailed information which fits into the following categories: 1) identity of the lobbyist, 2) identity of the principal, 3) area of attempted influence, 4) nature and interests of the principal, 5) expenditures for lobbying activities, and 6) exchanges of things of value with state officials and closely related persons or organizations.
Compelled disclosure, in itself, can seriously infringe on the privacy of association and belief guaranteed by thefirst amendment. Buckley v. Valeo, supra, 64. The invasion of privacy may be as great when the information sought concerns the expenditure of money as when it deals with beliefs directly, for financial transactions reveal much about a person's activities, associations and beliefs. Id., 66.
But there are governmental interests sufficient to outweigh the possibility of infringement, especially when the free functioning of representative institutions is involved. Ibid. Disclosure facilitates the ability of public officials properly to assess the pressures put on them. United States v. Harriss, supra, 625. Similarly, disclosure provides voters with information about the sources and magnitude of financial and persuasional influences on the government, enabling the electorate to evaluate the performance of public officials with respect to the interests, public or special, to which they are responsive. Fritz v. Gorton,supra 931. Cf. Buckley v. Valeo, supra, 66, 67. Exposure to the light of publicity discourages corrupt influences and avoids the appearance of corruption. Buckely v. Valeo, supra, 67. Finally, recordkeeping, reporting and disclosure requirements are an essential means of gathering the data necessary to detect violations of lobbying laws. Id., 68.
For these reasons the Legislature is not constitutionally forbidden to require the disclosure of lobbying activities, either by persons hired to influence governmental action, or by those paying others to act on their behalf. United States v.Harriss, supra, 625; Advisory Opinion *Page 103 on the Constitutionality of 1975 PA 227, supra, 23; Fritz v.Gorton, supra, 930. See State v. Decker, 258 Wis. 177, 181,45 N.W.2d 98 (1950). See generally Note: Improving the LegislativeProcess, 56 Yale L.J. 304, 313-316 (1947). Those particular activities required to be disclosed, however, must be restricted to those which are substantially related to the significant governmental interests they are supposed to serve. Buckley v.Valeo, supra, 64; NAACP v. Alabama, supra, 463. See United Statesv. Harriss, supra, 626.
Information identifying both lobbyist and principal obviously is indispensable to implementation of all these interests. SeeUnited States v. Harriss, supra, 625; Fritz v. Gorton, supra, 931.
Knowledge of the area of attempted influence is necessary to enable public officials to assess the pressures on them, and to enable the public to assess the success of pressures on their officials. Before an official intelligently can evaluate what he is being told by a lobbyist, he must understand why it is being told. See United States v. Harriss, supra, 625; Fritz v. Gorton,supra, 931. Before the public can judge the effect of influence on its officials, it must be made aware of the areas where influence has been applied. See Fritz v. Gorton, supra, 931.
Disclosure of the nature and interests of the principal[5]
certainly is essential to official evaluation of lobbyist pressures. It prevents the voice of the people from being drowned out by the cries of special interest groups seeking favored treatment while masquerading as proponents of the public good.United States v. Harriss, supra, 625. Such disclosure, moreover, directly provides voters information about the sources of the influences on their government. See Fritz v. Gorton, supra, 931. And clearly those with corrupt interests will be discouraged from seeking government support for them if state officials and the people they serve are aware of their purposes. As Mr. Justice Brandeis advised:
 "`Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman."' Quoted in Buckley v. Valeo, supra, 67. *Page 104 
Itemization of expenditures for lobbying activities enables both state officials and their constituents to assess the magnitude of the monetary pressures on their government, providing a proper perspective of the role that financial influence plays in official decision making. Fritz v. Gorton,supra, 930, 931. Exposure of individual expenditures also aids in avoiding corruption and its appearance by inhibiting spending for improper purposes, and by demonstrating the propriety of most expenditures. Cf. In re Kading, supra, 527, 528. The data provided unquestionably assists in detecting violations of lobbying laws.
Expenditures for advertising and public information are, in my opinion, however, improperly required to be itemized. AS discussed earlier, persuasive efforts aimed at indirect communication with lawmakers by influencing public opinion cannot be subjected to regulation by the government. The required itemization of expenditures for public information directly violates this immunity. And since the requirement for itemization of expenditures for advertising does not distinguish between advertising which attempts to influence public opinion and advertising which seeks to solicit direct communication with lawmakers, it too infringes on the exercise of activities immune from lobbying regulations.
Disclosure of exchanges of things of value with public officials and those persons or organizations closely related to public officials inhibits the flow of secret money from inappropriate special interest sources to government officials for inappropriate purposes. Fritz v. Gorton, supra, 931. It also enables the public and their guardians in government to detect abuses by other public officials.
With the single exception noted above, the disclosure requirements of the proposed legislation meet thefirst amendment's standard of substantial relation to a compelling governmental purpose. In meeting this stringent standard they surpass the requirements imposed by the fourth amendment on forced disclosure.
It is well settled that the fourth amendment's prohibition of unreasonable searches and seizures does not forbid an administrative agency to require the submission of reports regarding regulated activity. SEC v. Kaplan, 397 F. Supp. 564,568 (E.D. N.Y. 1975), citing Davis, Administrative Law Text, 55 (3rd ed. 1972); Dixon v. Pennsylvania Crime Commission,347 F. Supp. 138 (M.D. Pa. *Page 105 
1972). See California Bankers Assn. v. Shultz, 416 U.S. 21, 59-62
(1974), and cases cited. The fourth amendment demands only that the disclosure required not be unreasonable. California BankersAssn. v. Shultz, supra, 67, and cases cited. If the information is sufficiently described and limited in nature, and is reasonably relevant to an inquiry which the agency has authority to make, it can be compelled, consistent with constitutional protection against unreasonable searches and seizures. Ibid. SeeAdvisory Opinion on the Constitutionality of 1975 PA 227, supra,21.
The information sought by Substitute Amendment 3 certainly is specific, and, as discussed above, is limited, not simply to matters which are reasonably related to an authorized inquiry, but to information which is substantially related to an inquiry serving a compelling state interest.
No questions respecting self-incrimination under thefifth amendment privilege are presented since disclosure is demanded of a broad group, operating in an essentially noncriminal and regulatory area, rather than of a highly select group, inherently suspected of criminal activities, operating in an area permeated with criminal statutes. See generally California v. Byers,402 U.S. 424, 430 (1971), and cases cited.
Identical, substantially similar or even more detailed disclosure requirements have been approved as constitutionally permissible lobbying regulations in Harriss, pp. 614, 615, nn. 1, 2; the Michigan Supreme Court's Advisory Opinion, p. 22; andFritz, pp. 927, 928, n. 4, as well as in a few other cases.[6]
No authority has been found, which has not been overruled on appeal, which declares any similar provisions, except the itemization of expenditures for advertising and public information, to be unconstitutional. In my opinion, therefore, all but one of the disclosure requirements of Substitute Amendment 3 are a constitutionally valid exercise of the Legislature's power to regulate lobbying activities.
 VIII. Sec. 34 Auditing *Page 106 
Section 34 mandates random audits by the board on elections and lobbying of the statements filed by principals, and gives the board permission to inspect all accounts and financial records relating to them required to be kept by principals and lobbyists. The board is empowered to subpoena persons to appear before it and to "require the production of any papers, books or other records relevant to an investigation." Records kept by financial institutions need not be subpoenaed, but may be inspected and copied at the institution if a circuit court so orders upon a showing of probable cause to believe that there has been a violation of the lobbying laws.
Inspection of records kept in connection with the expense statements discussed previously is permitted under the required records doctrine of Shapiro v. United States, 335 U.S. 1 (1948).Accord, Marchetti v. United States, 390 U.S. 39 (1968). Records required to be kept by law in order that there may be suitable information of transactions which are an appropriate subject of government regulation, and enforcement of validly established restrictions, are not privileged like private papers. Marchettiv. United States, supra, 55, quoting Shapiro v. United States,supra, 33. They may be inspected without warrant or other legal process when they are of the kind customarily kept, there is a public aspect to them, and they relate to an essentially non-criminal and regulatory area of inquiry. Marchetti v.United States, supra, 57. The records required to be kept by principals and lobbyists are the kind customarily kept by those who employ or are employed in any venture involving persuasive activities. There is a plain public aspect to records of attempts to influence the decisions of state government. And lobbying is essentially a regulatory area of inquiry with few criminal provisions.
In the exercise of their investigative powers, administrative bodies may be authorized to issue both simple subpoenas, requiring persons to appear and testify personally, and subpoenas duces tecum, requiring persons to produce relevant documents. 73 C.J.S., Public Administrative Bodies and Procedure, sec. 86, pp. 408, 409. See also Davis, Administrative Law Treatise, ch. 3, p. 78, et seq. (1970 Supp.). The power to subpoena, however, must be exercised within the limits of the first, fourth andfifth amendments of the constitution. United States v. Dionisio,410 U.S. 1, 11, 12 (1973). *Page 107 
The first amendment prevents use of the power to investigate, enforced by the power of contempt, oppressively to probe at will and without relation to existing need. De Gregory v. AttorneyGeneral, 383 U.S. 825, 829 (1966); Watkins v. United States,354 U.S. 178, 197-200 (1957). Intrusion into the realm of protected political privacy by demanding disclosure from an unwilling witness may be justified only when a substantial state purpose is served by compulsion of information substantially related to that purpose. De Gregory v. Attorney General, supra, 829; Gibson v.Florida Investigating Committee, 372 U.S. 539, 545, 546 (1963);Watkins v. United States, supra, 199, 200. The interests which justify compulsion of information and the information which can be compelled under the first amendment were discussed in the preceding section.
A subpoena to testify is not the kind of state intrusion on privacy against which the fourth amendment offers protection, once the fifth amendment privilege against self-incrimination is satisfied. United States v. Dionisio, supra, 10. Thefourth amendment provides protection against a subpoena duces tecum only insofar as it is too sweeping in its terms to be regarded as reasonable. Id., 11, and cases cited. Again, the same sorts of information which the first amendment permits to be produced under subpoena are permitted by the fourth's lesser degree of protection.
The protection of the privilege against self-incrimination is limited to compulsion of incriminating live testimony from the mouth of the subpoenaed witness, and to production of private books and records in the witness' possession that would incriminate him. United States v. Dionisio, supra, 11. The privilege does not apply to books and records in the hands of a third person, Fisher v. United States, 425 U.S. 391, 397, 398
(1976); Couch v. United States, 409 U.S. 322, 329 (1973), or to the records of a partnership, Bellis v. United States, 417 U.S. 85
(1974), or corporation. California Bankers Assn. v. Shultz,supra, 71; Hale v. Henkel, 201 U.S. 43 (1906).
Although sec. 34 does not by its own terms incorporate all these constitutional guarantees, the subpoenas it authorizes, like those issued by any other board, are enforced by contempt proceedings before a court of law. Sec. 885.12, Stats. In such proceedings constitutional objections to the compulsion of testimony or documents can be raised and, if raised correctly, vindicated. See, *Page 108 United States v. Miller, 425 U.S. 435, 444, n. 6 (1976); State v.Balistrieri, 55 Wis.2d 513, 522-524, 201 N.W.2d 18 (1972); Stateex rel. St. Mary's Hospital v. Industrial Comm., 250 Wis. 516,520, 27 N.W.2d 478 (1947); sec. 885.12, Stats. Because of this judicial check on the broad language of the subpoena provision, which unchecked would be unconstitutional, I am of the opinion that, in theory at least, the provision meets constitutional standards for compulsion of information by subpoena.
I cannot ignore the possibility, though, that in practice even judicial review of the board's subpoena power may not be sufficient to save this provision from being unconstitutional as applied.
Since contempt proceedings and the papers which initiate them are public, the public may inspect, and the press may publish, the accusations that those associated with lobbying are hiding records which will reveal information about their activities that the state has a right and a reason to know. See generally CoxBroadcasting Corp. v. Cohn, 420 U.S. 469, 495 (1975).
Such accusations alone, even though erroneous, might in many cases discredit, in the eyes of citizens and statesmen alike, lobbyists or principals who resist unwarranted intrusion into their protected private affairs.
 "The finger of government leveled against the [lobbyist] is ominous." United States v. Rumely, supra, 57 (Douglas, J., dissenting).
As was pointed out in Watkins v. United States, supra, 197: "Abuses of the investigative process may imperceptibly lead to abridgement of protected freedoms." Discrediting a lobbyist or principal simply by instituting unwarranted contempt proceedings could effectively nullify their right to petition the government by means of lobbying, at least until they could vindicate themselves at a later adversary hearing, and perhaps not even then. The whole purpose of the lobbying law, after all. is to separate the forthright lobbyists and principals from those who have something to hide about their persuasive activities. The subpoena provisions, in these circumstances, could impose the equivalent of constitutionally impermissible prior censorship on lobbying activities. Cf: United States v. Rumely, supra, 57 (Douglas, J., dissenting). See generally, State v. I, A Woman — Part II, supra, 112, 113, and cases cited. *Page 109 
In a somewhat analogous situation the United States Supreme Court upheld the issuance of grand jury subpoenas to news reporters in part because the secrecy of grand jury proceedings provided protection against invasion of first amendment rights by exposure. Branzburg v. Hayes, 408 U.S. 691, 695 (1972). No such protective secrecy is provided for in Substitute Amendment 3.
I am thus unable to say with absolute certainty that sec. 34 as applied to all situations would be constitutional. There is some very limited support in the cases for an argument along the lines suggested above that the section would be unconstitutional as applied where a lobbyist who properly resisted unwarranted intrusion could show evidence of damage to reputation, loss of livelihood, and harm to other property or liberty interests by the necessity to defend against the subpoena in contempt proceedings. In other words, the claim would have to be that the defense of the right to resist carried an impossible cost. On balance, however, I think this section probably would withstand constitutional attack.
No comparable safeguards are provided, regrettably, with respect to accounts and deposit and loan records at any financial institution. Section 34 permits unrestricted inspection of such records simply on judicial showing of probable cause to believe that there has been a violation of the lobbying laws. There is no requirement, as in the case of a search warrant, that the would be inspector demonstrate probable cause to believe that particular evidence of the violation will be found in these records, or that the inspection order specify the places to be searched and the records to be inspected or copied. Since the application for an inspection order may be made ex parte, the person whose records are inspected has no opportunity to challenge the propriety of the inspection in an adversary proceeding, such as a contempt proceeding in the case of compulsion by subpoena.
This deficiency poses no problems under the fourth amendment, since inspection does not intrude into an area where the institution's customer has an interest protected by that amendment, there being no reasonable expectation of privacy in records exposed to bank employes in the ordinary course of business. United States v. Miller, supra, 442, 443. Nor does it pose any problem under the fifth amendment, since no compulsion is exerted against the person who may be incriminated by what the bank's records reveal. Fisher v. United States, supra, 397; Couchv. United States, supra, 328. *Page 110 
From what has been discussed previously, however, it is plain that ex parte permission to inspect records simply on a showing of probable cause to believe that the customer has violated lobbying laws violates the first amendment rights of the customer. To comport with the protection afforded by thefirst amendment it is necessary that the inspection be limited to information which is substantially related to a compelling state interest. The existence of such an interest arguably is shown by probable cause to believe that the lobbying laws which serve a substantial state interest have been violated. But this showing alone does not necessarily demonstrate as well that any or all financial records will contain information substantially related to the violation.
As presently written the proposed legislation would permit the state, through essentially "`unreviewed executive discretion"' to make a wide ranging inquiry that unnecessarily touches on intimate areas of an individual's personal affairs. SeeUnited States v. Miller, supra, 444 n. 6, citing California BankersAssn. v. Shultz, supra, 77, 78 (Powell, J., concurring). Without some provision limiting the scope of the inspection to financial records which have a substantial relation to violation of the lobbying laws, this particular provision of Substitute Amendment 3 is unconstitutionally overbroad.
IX. Conclusion
In principle, the purposes sought to be accomplished by Substitute Amendment 3 are compatible with the rights of Wisconsin citizens to petition the government and to be secure against unreasonable searches and seizures. Some of the means selected to accomplish those purposes may, on their face or as applied, violate citizens' first amendment right of petition.
BCL:TJB
[1] Presumably, lobbying is protected as well by the parallel state provision, Wis. Const art I. sec. 4. See generally MadisonJoint School Dist. No. 8 v. WERC, 69 Wis.2d 200, 210,231 N.W.2d 206 (1975).
[2] Absent any clear expression of legislative intent to the contrary, the general phrase "or other interest" following "pecuniary" must be construed in accord with the rule of ejusdem generis to include only interests in the same general category as the pecuniary interest enumerated. See generally La Barge v.State, 74 Wis.2d 327, 332, 246 N.W.2d 794 (1976).
I would point out that the words "anything of pecuniary value" as used in sec. 16 are nowhere defined in current law or in the bill. The words "anything of value" appear and are defined in chapters 12 and 19 of the statutes and the words "pecuniary interests" are defined in sec. 13.62 (7), Stats., which is unaffected by the bill. Failure to specifically define this term could lead to an argument that the law is unconstitutionally vague and thus a narrow and carefully drawn definition should be provided.
[3] One effect of these proscriptions is to distinguish between the Governor and other state officials in certain areas and legislators and other officers and employes in other areas. The propriety of these distinctions under an equal protection analysis is questionable.
[4] These arguments appear to apply with similar vigor to the relationship between a principal and the children under the principal's control. Cf. Pierce v. Society of Sisters, 268 U.S. 510,534, 535 (1925); Meyer v. Nebraska, supra, 399.
[5] For general comment on the right to require disclosure of the purpose and nature of activities of organizations see Batesv. Little Rock, 361 U.S. 516 (1960); NAACP v. Alabama, supra.
[6] Analogous financial disclosure requirements for candidates for elective office and public officials have been approved in numerous cases. See, e.g., Buckley v. Valeo, supra,In re Kading, supra, and cases cited.